Harry T. Gause, Appellant, *v.* Commonwealth Trust Company of New York, Respondent.

Corporations — powers of trust companies confined to those expressly conferred by statute or necessary to exercise of such powers — illegal guaranty of stock pooling agreement by trust company — unauthorized execution of agreement by officers of trust company.

The unexpressed and incidental powers possessed by a corporation are not limited to such as are absolutely or indispensably necessary to enable it to exercise the powers specifically granted, and whatever incidental powers are reasonably necessary to enable it to perform its corporate functions are implied from the powers affirmatively granted. But powers merely convenient or useful are not implied if they are not essential, having in view the nature and object of the incorporation.

The authority of a corporation to perform a particular act is always dependent to a very considerable extent upon the facts and circumstances existing at the time when it is proposed to perform the act.

The courts, in considering the effect of *ultra vires* acts, have always recognized the distinction between business and trading corporations and corporations whose purposes are largely fiduciary.

The legislature intended and the public interests demand that trust companies shall be confined not only within the words, but also within the spirit of the statutory provision which declares that a corporation shall not possess or exercise any corporate powers not given by law or not necessary to the exercise of the powers so given. Such authority does not permit a trust company to enter into speculative and uncertain schemes or, unless under peculiar circumstances, to become the guarantor of the indebtedness or business of others. Its authority to buy and sell stocks and bonds does not authorize it to indulge in hazardous

promoting schemes, although it may hope from the successful launching of such schemes to make large commissions and receive large bonuses.

Although the presence of the scal of a corporation upon an instrument is *prima facie* proof that it was attached by proper authority, it is such proof as may be conclusively rebutted.

The vice-president of a trust company signed an agreement in the name of the company with the owner of certain stocks and bonds of a corporation organized for the purpose of acquiring, combining and maintaining the property and business of certain previously existing plants, of which corporation the vice-president of the defendant, who signed the writing in suit, was also a vice-president. The instrument was sealed with the corporate seal and attested by an assistant secretary of the trust company. The seal of the corporation was affixed thereto without statutory or other authority. The alleged agreement guaranteed to the party, with whom it was made, the sale of the securities therein described at a price therein fixed within a specified period. No action authorizing the execution of such contract was considered or passed by either its board of directors, executive committee or stockholders. The purpose of the alleged agreement was to bring the party, with whom it was made, into a pooling agreement to protect the price of such securities. The trust company did not become the owner or purchaser of any of the securities and was not to profit directly in any way by their sale, but became the guarantor of a " future " and in substance of the prosperity and success of the speculative enterprise. *Held*, that the alleged agreement was signed and the corporate seal attached thereto without authority, and that the contract was outside the corporate powers of the trust company.

As stated therein, the contract in question was signed for the purpose of aiding a so called pooling or syndicate agreement, then executed or subsequently to be executed, and its purpose and consideration was wholly dependent upon the syndicate agreement. In view of the fact that the syndicate agreement was not consummated or its provisions carried out, the trust company did not obtain any advantage from or consideration for the alleged agreement of guaranty, and no recovery can be had thereon.

*Gause* v. *Commonwealth Trust Co.*, 124 App. Div. 438, affirmed.

(Argued June 7, 1909; decided October 19, 1909.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 4, 1908, affirming a judgment in favor of defendant entered upon a dismissal of the complaint by the court at a Trial Term.

On the 26th day of September, 1902, a written memoran-
dum of agreement, dated August 28, 1902, was signed in the
name of the defendant by one of its vice-presidents. It was
sealed with the corporate seal and attested by an assistant
secretary of the defendant, and it was also signed and sealed
by the plaintiff. Duplicates were retained by the plaintiff
and said vice-president. Said writing is as follows:

" Memorandum of Agreement made this 28th day of August,
    A. D. 1902, by and between the Trust Company of the
    Republic, a corporation organized under the laws of New
    York, party of the first part, and Harry T. Gause, of
    Wilmington, Delaware, party of the second part.

" *Witnesseth :* For and in consideration of the sum of one
dollar in hand paid to him by the party of the first part the
receipt whereof is hereby acknowledged by the party of the
second part and for other good and valuable considerations,
it is understood and agreed by and between the parties hereto
as follows:

" 1. WHEREAS it is the mutual desire of the parties hereto
that the securities of the United States Shipbuilding Company
shall be sold to the best advantage, both parties being inter-
ested in same, and

" WHEREAS a selling syndicate of which Thomas C. Clarke
is named as manager has been formed to arrange for such
sales and for other purposes under an agreement providing for
the deposit of all of said securities except those of the party
hereto of the second part with the party hereto of the first
part for such purposes, both parties hereto will in good faith
co-operate with the said syndicate in furthering such object
and this agreement is intended to be an aid to same.

" 2. The party of the second part agrees that he will deposit
with the party of the first part all of his bonds and shares of
preferred and common stock of the United States Shipbuild-
ing Company under the terms and conditions of this agree-
ment as hereinafter set forth.

" 3. The party of the first part will use and dispose of said
securities of the party of the second part as in its judgment is

necessary to further the purposes of said syndicate and in so doing will do whatever is necessary, to insure equal benefits to the party hereto of the second part *pro rata* to his holdings of said securities that are enjoyed at any time by the vendors who shall be or become parties to the agreement with said syndicate in connection with the sale and disposition of said securities or the proceeds of sale of same, and it hereby guarantees to the party of the second part the sale of all of his said securities on or before August 25th, 1903, whether through the efforts of said syndicate or otherwise and the party of the first part agrees to account to the party of the second part on or before the 25th day of August, 1903, and that the prices thereof shall be on the basis which will realize to the party of the second part not less than 95 per cent of the par value of the bonds and 68 per cent of the par value of the said preferred stock and 25 per cent of the par value of the said common stock less brokerage expenses, as hereinafter stated and the party of the first part hereby agrees to pay to the party of the second part the interest on the bonds as and when received from the United States Shipbuilding Company during the period of this agreement; and in case of their sale or any of them during the period of this agreement and if under such circumstances it elects to retain the proceeds of the sale of the same under the provisions hereof until the final accounting hereunder the party of the first part agrees to pay to the party of the second part the accrued interest on such bonds as may be sold up to the dates of their sale, and also interest on the proceeds of the sale of same, at the same rate that the bonds would have earned if same had not been deposited under the terms of this agreement, said payments of interest to be made January 1st and July 1st, 1903, if this agreement is not sooner terminated, but at its termination at any time payment is to be made in full.

"4. The party of the first part is hereby accorded the exclusive right to sell the said securities of the party of the second part during the period of this agreement.

"5. The party of the first part shall have authority from

time to time at any time to pay the usual brokerage and broker's expenses if any in connection with the sale of said securities of the party of the second part.

" 6. Said party of the first part shall not be liable for any error of judgment or for any mistake of law or fact, nor shall it be liable for any act or omission while endeavoring in good faith to carry out the purposes hereof according to its judgment, but such exemption of liability shall not affect its liability named in clause 3 hereof. No obligation or liability in addition to those herein expressed shall be implied against the said party of the first part; it being the spirit and intent of this agreement that said securities are deposited as named under a guaranty of sale at not less than the minimum figures hereinbefore mentioned, and all proceeds of sale are to be accounted for at the figures at which such sales shall be made and the same with all incidental net profits in connection with the same.

" 7. This agreement and all it contains shall become null and void on August 25, 1903, or at any time prior thereto coincident with the sale of and settlement for all of the said securities of the party of the second part or the termination of the said syndicate by the fulfillment of its agreement with the other vendors and underwriters of the said securities."

The bonds and stocks mentioned therein were not sold on or prior to August 25, 1903, and thereafter the plaintiff brought this action alleging that the securities mentioned in said writing were on said August 25, 1903, substantially valueless and he demanded judgment for $404,630, with interest from said August 25, 1903.

The defendant among other things in its answer alleged in substance: 1. That the contract in suit is *ultra vires* to the defendant corporation.    2. That the officers who assumed to execute the contract in suit had no authority to bind the defendant.    3. That at the time of the execution of the contract in suit an agreement was entered into between the plaintiff and the officer of the defendant who assumed to execute the contract in behalf of the defendant that such contract

should not become effective or of binding force until a certain other contract or syndicate agreement had been signed and that in fact such syndicate agreement never was signed.

The trial took place before a justice of the Supreme Court and a jury and at the close of the trial the trial justice submitted to the jury for answer two questions as follows:

1. Were the officers who signed or directed the signing of the alleged agreement, that is, the agreement in suit here, authorized by the defendant corporation to execute it as its corporate act and affix thereto its corporate seal ?

2. Was the alleged agreement executed upon the condition that it was not to become effective until the so-called Clark agreement for the pooling of the securities of the United States Ship Building Company shall have been executed by all the holders of said securities other than the plaintiff ?

The jury answered the first question in the affirmative and the second in the negative. A motion was then made to set aside the verdict and subsequently the court disregarded the findings of the jury and dismissed the complaint. An opinion was written by the trial justice which is reported in 55 Miscellaneous Reports, 110.

The plaintiff appealed from the judgment entered upon the dismissal of said complaint and such judgment was subsequently affirmed in the Appellate Division (124 App. Div. 438). This appeal is taken from such judgment of affirmance. Further facts will be found in the opinion.

*Howard Taylor*, *Henry B. Anderson* and *William Williams* for appellant. The contract is plainly within both the letter and spirit of the powers of a trust company as enumerated in the Banking Law of this state. (L. 1892, ch. 689, § 156.) The presumption arising from the company's seal on the contract that defendant's officials had authority to execute such contract made the case one for the jury independent of further evidence for plaintiff. (*Quackenboss* v. *G. & R. F. Ins. Co.*, 177 N. Y. 71; *Ring* v. *L. I. R. E. E. Co.*, 93 App. Div. 442; *N. E. I. Co.* v. *G. E. R. R. Co.*, 91 N. Y.

154; *Jones* v. *U. Ry. Co.*, 18 App. Div. 267; *Justice* v. *Lang*, 52 N. Y. 323; *M. L. Ins. Co.* v. *Y. C. Nat. Bank*, 35 App. Div. 218; *Jourdan* v. *L. I. R. R. Co.*, 115 N. Y. 380; *Moss* v. *Averill*, 10 N. Y. 449; *Bruxmar* v. *Stanton*, 110 App. Div. 167; *Hoyt* v. *Thompson*, 19 N. Y. 207.) Both through the by-laws and also through the practice of the company original authority was vested in Mr. Dresser for the execution of this contract, and this independent of any knowledge thereof by the board or executive committee. (*Bogart* v. *N. Y. & L. I. R. R. Co.*, 118 App. Div. 50; *Hooke* v. *Financier Co.*, 99 App. Div. 186; *M. & F. Bank* v. *Smith*, 19 Johns. 115; *Powers* v. *Schlicht*, 23 App. Div. 380; *M. Co.* v. *A. C. Bank*, 104 U. S. 192; *Phillips* v. *Campbell*, 43 N. Y. 271; *S. P. & P. Co.* v. *Moore*, 183 U. S. 642; *Olcott* v. *T. R. R. Co.*, 27 N. Y. 546; *Chambers* v. *Lancaster*, 160 N. Y. 342; *Curnan* v. *D. & O. R. R. Co.*, 138 N. Y. 480.)

*D-Cady Herrick, James J. Farren* and *Francis S. Hutchins* for respondent. The defendant respondent had no power to enter into the contract in question. (*People ex rel. Tiffany* v. *Campbell*, 144 N. Y. 166; *Davis* v. *Railroad*, 131 Mass. 258; *Caldwell* v. *M. R. L. Assn.*, 53 App. Div. 245; *Leavitt* v. *Yates*, 4 Edw. Ch. 134; *Talmage* v. *Pell*, 7 N. Y. 328; *N. Bank* v. *Jones*, 95 N. Y. 115; *Jemison* v. *C. S. Bank*, 122 N. Y. 135; *Sistare* v. *Best*, 88 N. Y. 527; *H. M. Co.* v. *A. M. M. & M. Co.*, 62 Fed. Rep. 361.) The contract being one which the defendant had no power to make, it cannot be enforced against it. (*C. T. Co.* v. *P. P. C. Co.*, 139 U. S. 24; *F. Nat. Bank* v. *Hawkins*, 174 U. S. 364; *McCormack* v. *M. Nat. Bank*, 165 U. S. 550; *Jemison* v. *C. S. Bank*, 122 N. Y. 135.) The fact that such contract was executed by the vice president of the company, by direction of its president, does not constitute it a contract of the corporation. (Cook on Corp. § 716; Morawetz on Corp. § 527; *P. Bank* v. *S. A. R. C. Church*, 109 N. Y. 512; *Wilson* v. *K. C. E. R. R. Co.*, 114 N. Y.

487; *Leary* v. *A. B. Co.*, 77 App. Div. 6; *Bangs* v. *N. M. Co.*, 15 App. Div. 522; *Risley* v. *I. B. & W. R. Co.*, 1 Hun, 202.) The officers of a corporation can, in its name, transact only such business as the corporation has a right to engage in. (*Wilson* v. *K. C. E. R. R. Co.*, 114 N. Y. 487; *Leary* v. *A. B. Co.*, 77 App. Div. 6; *Alexander* v. *Cauldwell*, 83 N. Y. 480; *F. Nat. Bank* v. *O. Nat. Bank*, 60 N. Y. 278; *Nat. Park Bank* v. *G. A. M. W. & S. Co.*, 116 N. Y. 281; *B. T. Co.* v. *Dessau Co.*, 45 App. Div. 475.) The fact that the seal of the corporation was attached to the contract does not make it the contract of the corporation. (*Quackenboss* v. *G. R. F. Ins. Co.*, 177 N. Y. 71; Morawetz on Corp. § 617; Thompson on Corp. §§ 5055, 5105.) The contract was never ratified by the defendant, either expressly or by acquiescence. (*Kramrath* v. *City of Albany*, 127 N. Y. 575; *Matter of Niland*, 193 N. Y. 180; *Risley* v. *I. B. & W. R. Co.*, 1 Hun, 202; *Camacho* v. *H. B. N. & E. Co.*, 2 App. Div. 369; *Bright* v. *C. I. S. Y. Co.*, 83 Hun, 482; *Dent* v. *N. A. S. Co.*, 49 N. Y. 390.)

Chase, J. We concur in the result reached by the majority of the Appellate Division. The importance of the decision in this case in its relation to the administration of justice seems to require a written statement of opinion by this court, although in doing so we, to some extent, substantially repeat what has been well said herein by Justice Laughlin.

The defendant was organized in the name of "Trust Company of the Republic" March 29, 1902, pursuant to article 4 of the Banking Law of this state as it then existed. Its name was changed October 12, 1903, to "Commonwealth Trust Company of New York." The statute as it existed at that time defines a trust company to mean a domestic corporation "formed for the purpose of taking, accepting and executing such trusts as may be lawfully committed to it, and acting as trustee in the cases prescribed by law, and receiving deposits of moneys and other personal property, and issuing its obligations therefor, and of loaning money on real or personal secu-

rities." (*Banking Law* [chapter 689, Laws of 1892], sec. 2.) The powers of a trust company are expressly defined by statute and so far as applicable to this decision they are :

" 1. To act as the fiscal or transfer agent of any state, municipality, body politic or corporation; and in such capacity to receive and disburse money, and transfer, register and countersign certificates of stock, bonds or other evidences of indebtedness.

" 2. To receive deposits of trust moneys, securities and other personal property from any person or corporation, and to loan money on real or personal securities.

" 3.   *   *   *

" 4. To act as trustee under any mortgage or bond issued by any municipality, body politic or corporation, and accept and execute any other municipal or corporate trust not inconsistent with the laws of this state.

" 5. To accept trusts from and execute trusts for married women, in respect to their separate property, and to be their agent in the management of such property, or to transact any business in relation thereto.

" 6. To act under the order or appointment of any court of record as guardian, receiver or trustee of the estate of any minor, the annual income of which shall not be less than one hundred dollars, and as depository of any moneys paid into court, whether for the benefit of any such minor or other person, corporation or party.

" 7. To take, accept and execute any and all such legal trusts, duties and powers in regard to the holding, management and disposition of any estate, real or personal, and the rents and profits thereof, or the sale thereof, as may be granted or confided to it by any court of record, or by any person, corporation, municipality or other authority ; and it shall be accountable to all parties in interest for the faithful discharge of every such trust, duty or power which it may so accept.

" 8. To take, accept and execute any and all such trusts and powers of whatever nature or description as may be conferred upon or intrusted or committed to it by any person or persons,

or any body politic, corporation or other authority, by grant, assignment, transfer, devise, bequest or otherwise, or which may be intrusted or committed or transferred to it or vested in it by order of any court of record, or any surrogate, and to receive and take and hold any property or estate, real or personal, which may be the subject of any such trust.

" 9. To purchase, invest in, and sell stocks, bills of exchange, bonds and mortgages and other securities ; and when moneys, or securities for moneys are borrowed or received on deposit, or for investment, the bonds or obligations of the company may be given therefor, but it shall have no right to issue bills to circulate as money.

" 10. To be appointed and to accept the appointment of executor of or trustee under the last will and testament, or administrator with or without the will annexed, of the estate of any deceased person, and to be appointed and to act as the committee of the estates of lunatics, idiots, persons of unsound mind and habitual drunkards." (Banking Law, sec. 156.)

Among the statutory restrictions upon a trust company are the following : " No loan exceeding one-tenth of its capital stock, shall be made by any such corporation, (directly or indirectly) to any director or officer thereof and such loan to such director or officer shall not be made without the consent of a majority of the directors." (Banking Law, sec. 156, sub. 11.)

" No such corporation shall hold stock in any private corporation to an amount in excess of ten per cent of the capital of the corporation holding such stock." (Banking Law, sec. 159.)

It is also provided by statute that " No bond or other security, except as hereinafter (thereinafter) provided, shall be required from any such corporation for or in respect to any trust, nor when appointed executor, administrator, guardian, trustee, receiver, committee or depositary." (Banking Law, sec. 158.) The affairs of every such corporation shall be managed and its corporate powers exercised by a board of directors. (Banking Law, sec. 161.)

The General Corporation Law (Laws of 1892, chapter 687)

is made applicable to a trust company (Banking Law, sec. 156), and it provides that "No corporation shall possess or exercise any corporate powers not given by law, or not necessary to the exercise of the powers so given." (General Corporation Law, sec. 10.) Also "To make by-laws, not inconsistent with any existing law, for the management of its property, the regulation of its affairs * * *." (Sec. 11, sub. 5.)

The unexpressed and incidental powers possessed by a corporation are not limited to such as are absolutely or indispensably necessary to enable it to exercise the powers specifically granted. Whatever incidental powers are reasonably necessary to enable it to perform its corporate functions are implied from the powers affirmatively granted. But powers merely convenient or useful are not implied if they are not essential having in view the nature and object of the incorporation. (*People ex rel. Tiffany & Co.* v. *Campbell*, 144 N. Y. 166, 172; Thompson on Corporations [2d ed.], sec. 2113; Frost on New York Corporations, 146.)

By the by-laws adopted by the defendant the president is authorized on all occasions to "exercise such general direction and supervision over all the affairs of the company as its interests and security may require." And he also is given power "to affix the corporate seal of the company to the following described instruments, providing they have been prepared by the general counsel or attorney of the company, viz. :" (to certain instruments requiring a corporate seal, not including the contract with the plaintiff.)

Vice-presidents are given certain duties to be assigned to them from time to time by the executive committee or the president, or to act temporarily as president in case of his death, absence or disability.

They provide for an executive committee to consist of the president and six directors, three of which, if the president be one, or a majority of which, if the president be absent, constitute a quorum for the transaction of business.

The executive committee is authorized to exercise the powers of the board of directors when the board is not in

session.    The assent of the executive committee is required
to all investments that shall be made of the funds of the
company in stocks, personal securities and bonds . and mort-
gages except as in the by-laws˙specially provided, which
exception does not affect the case now before us.    Special
provision is made in the by-laws for the use of the seal which
so far as it relates to this decision is as follows : " The seal of
the company shall be in the custody of the president and shall
not be affixed to any deed, conveyance or instrument other
than those enumerated in article 3, section 6, of these by-laws
(the provision hereinbefore referred to) unless by the author-
ity of the board or the executive committee and whenever
affixed to any paper it shall be attested by the secretary."

The authority of a corporation to perform a particular act
is always dependent to a very considerable extent upon the
facts and circumstances existing at the time when it is pro-
posed to perform the act.˙ Thus in *Appleton* v. *Citizens'
Central National Bank* (190 N. Y. 417) this court held in
substance that a guaranty by a national bank of a note for an
amount in excess of the pecuniary interest therein of the
bank was *ultra vires* and not binding upon the bank, but that
such guaranty, to the amount which the guaranteeing bank
under its agreement with the maker of the note received
out of the loan, was within the legitimate powers of the
banking corporation.

It is necessary, therefore, in this case, to examine the facts
and circumstances existing at and prior to the execution of
the writing with the plaintiff.    Counsel for the respective
parties do not agree upon the facts or upon the inferences
that should or may be drawn from the facts as stated in the
record.    We will briefly state the material facts that are
either not disputed or that are in our opinion conclusively
and incontrovertibly established.

In June, 1902, and very soon after the defendant was
organized and commenced the transaction of business, a cor-
poration by the name of the United States Shipbuilding
Company was organized, under the laws of the state of New

Jersey, for the purpose of acquiring, combining and maintaining the property and business of certain previously existing iron, steel and shipbuilding plants. The president of the defendant became one of its directors and the vice-president of the defendant who signed the writing in suit in the defendant's name became one of its vice-presidents. Options were obtained by individuals for and in behalf of the shipbuilding company to purchase the property and business of said iron, steel and shipbuilding companies, each of which options by its terms expired August 11, 1902. Under the plan of the shipbuilding company the constituent plants were to be paid for under said options partly in cash and partly in the bonds and stock of the company. To accept the options and perform its promises it was necessary for the shipbuilding company to have $8,100,000 of cash on August 11, 1902. It was proposed to raise the necessary cash by selling $9,000,000 of the bonds of the shipbuilding company at 90% of their par value. Another trust company was made trustee of the shipbuilding company bonds. Such trust company and certain individuals interested in the shipbuilding company requested the president of the defendant to solicit underwriters for said bonds to the extent of $3,000,000 thereof. It was then stated that $3,000,000 of the bonds were to be underwritten in England and $3,000,000 thereof in France. The president of the defendant did solicit underwriting agreements, and we will assume that he did so in behalf of the defendant, and he procured underwriting agreements running in the name of said other trust company to the extent of $3,000,000. It was thereupon arranged that the defendant should be the bank of deposit for said shipbuilding company and to act,

" a. As issuing bankers and perform all the duties incidental thereto.

" b. Advertise prospectus.

" c. Receive all subscriptions.

" d. Pay the necessary cash to the trustees to clear the titles and commitments thereto.

" e. Deliver all bonds and shares to the subscribers.

" f. Registrar and transfer agent of the shares of the company."

For the services of the defendant it was to be paid by the shipbuilding company partly in cash and partly in bonds and stock of the company, the amount of which does not appear. Prior to August 11 it was ascertained that the defendant had failed to obtain the underwriting agreements for its bonds as expected in England, and the defendant's president was requested to solicit further underwriting agreements, which he did to the extent of $1,700,000. Subsequently and before August 11 it was further ascertained that the defendant had failed to obtain the underwriting agreements for its bonds as expected in France.

The relation of the defendant to the shipbuilding company on August 11 is shown by the statement that we have already made. It was generally interested in the company because of its relation to it as stated, but not otherwise except that it expected from it to obtain compensation for its services. So far as the record discloses it was not an underwriter for any part of its bonds or the owner of any of its bonds or stock, and it had not incurred any liability growing out of its president's soliciting underwriting agreements. It may be assumed that the president of the defendant had fully reported to its board of directors every act and promise to or in behalf of the shipbuilding company occurring or made prior to, on or about August 11, 1902. Such acts and promises were, we will assume, within the usual course of its business. On or about that day the defendant made loans to its customers on notes with the shipbuilding company bonds and stocks as collateral to an amount aggregating about $300,000. There is nothing in the record to show whether such loans were collectible apart from the collateral. Such loans may have been ill-advised, but they were in the usual course of its business. Officers of the shipbuilding company requested the president of the defendant to obtain the large amounts of money necessary in addition to the amount that the shipbuilding company had to take up said options, and offered him the securities of

the shipbuilding company to use as collateral for that purpose. He procured such loans. It was done by him by borrowing from other financial institutions $750,000 on the notes of the defendant and $3,162,000 on the individual notes of certain officers and directors (including himself) of the shipbuilding company. Bonds and stock of the shipbuilding company were used as collateral to all these loans and it seems to be conceded that the notes aggregating $3,162,000 were guaranteed by the defendant by writings signed by its president or said vice-president or by employees immediately under their direction. The only written evidence of such guaranties before us is confined to two letters, one dated August 12, 1902, directed to the New York Security & Trust Co., as follows :

"Referring to the loan made by you to Mr. Lewis Nixon and Mr. Daniel Le Roy Dresser and in accordance with your request we hereby guaranty the payment at maturity.".

"Yours very truly,
"DANIEL LE ROY DRESSER, *President.*"

And one dated August 29, 1902, directed to the National Park Bank as follows :

"As per arrangements made by Mr. Dresser we beg to hand you herewith note signed by Mr. Lewis Nixon and Mr. Daniel Le Roy Dresser for four months for $500,000 with the following collateral : (shipbuilding company bonds and stock). This company guarantees the payment of this loan at maturity of said notes.

"Yours very truly,
"WOODWARD BABCOCK, *Ass't. Sec.*"

Said president of the defendant in explanation of his voluntarily making the defendant apparently liable for an amount more than double its entire capital and surplus testified that he thought it safe to do so by reason of the value of the said collateral and that he supposed the loans were temporary.

The title of the several constituent companies making up the plant of the new shipbuilding company was transferred to

it on said August 11, and the money paid and securities transferred as per the option agreements. On that day an agreement was entered into by and between the defendant, said Dresser, and said Nixon party of the first part, one Charles M. Schwab of the second part and Harris Gates & Company of the third part relating to the sale of certain specified stocks of the shipbuilding company and the disposition of the proceeds thereof in which contract the defendant's position is wholly that of a trustee. The officers of the shipbuilding company and the owners of the bonds and stock of the company or a large part of them desired for their mutual protection to enter into a pooling agreement in regard to the sale of such bonds and stock, and a proposed agreement was prepared, of which the following is a copy of the material part, viz. :

"Agreement made this — day of August 1902 by and between Thomas C. Clark party of the first part (hereinafter called the 'manager') and the several vendors herein named parties of the second part (hereinafter called the 'vendors.')

" Whereas the Manager represents certain underwriters and other parties who are entitled to bonds and preferred and common stock of United States Shipbuilding Company and is authorized to sell and dispose of the said bonds and stocks ; and

" Whereas the vendors are the owners of certain amounts of said bonds and stocks of said company ; and

" Whereas the said Manager representing said underwriters and other parties and the vendors wish to sell and dispose of a portion of said bonds and stocks and to have the Manager take entire control of such sale for the pro rata benefit of all the parties hereto ; Now This Agreement Witnesseth :

"*First.* The vendors hereby agree that they will deposit with the Trust Company of the Republic the amount of bonds and preferred and common shares of the United States Shipbuilding Company set opposite their respective names.

"*Second.* That the Manager shall have the right at any time or times prior to the 25th day of August, 1903, to sell and dispose of said bonds and stocks at public or private sale and at such prices as he may deem expedient, provided that the prices thereof shall not be less than —— per cent of the par value of said bonds, —— per cent of the par value of said preferred stock, and —— per cent of the par value of said common stock. The proceeds of such sale shall be deposited with the Trust Company of the Republic to the credit of the Manager.

"*Third.* Until the 25th day of August, 1903, or until the final distribution hereunder prior to said 25th day of August, 1903, the said Manager for account of the parties hereto shall have power to purchase and resell the said bonds and stocks in his discretion and may apply toward any such purchases any sum or sums realized from any previous sales of bonds and stocks and make advances or procure loans and secure the same to such amounts and in such manner as from time to time he may deem expedient for any of the purposes of this agreement. * * *"

The plaintiff received from the sale to the shipbuilding company of the Harlan & Hollingsworth Company, one of the constituent companies, a substantial amount of the bonds and stocks of the shipbuilding company. He declined to sign the proposed pooling agreement from which we have quoted, but insisted that if he joined in the pooling agreement he should have a guaranty signed by a responsible party. The vice-president of the defendant, who subsequently signed the writing with the plaintiff, made at least two trips to Wilmington, the home of the plaintiff, to induce him to join the pooling agreement. There was considerable correspondence between them, all of the letters from the plaintiff being addressed to said vice-president and the letters to the plaintiff being signed in the name of the defendant by such vice-president or one Babcock, an assistant secretary associated with him in the branch office of the defendant. The agreement with the plaintiff in suit was signed by such vice-president

with the knowledge and direction of the president. The negotiations with the plaintiff and the execution of the agreement as stated, although open and public at the defendant's branch office, were without the knowledge of the defendant's board of directors or officers except as stated and to such extent they were secretly done.

It is unnecessary for the purposes of this decision to relate the details of the transactions occurring after September 26, 1902, except in a few particulars. In October a syndicate was formed to furnish money to pay said loans of August 11, 1902, and thus relieve the makers thereof from liability thereon, and also at the same time relieve the trust company from any further claim of liability on its part by reason of its being the maker or the guarantor of any or all of such loans. In January, 1903, the plaintiff tendered to said vice-president of the defendant at the defendant's branch office the bonds and securities mentioned in the writing with him. They were declined by said vice-president because, as alleged, of insufficient space in the vaults of the defendant to store them and the plaintiff asserts that he held such bonds and stocks for the benefit of the defendant thereafter. Prior to June, 1903, the president and said vice-president of the defendant during 1902, severed their connection with the defendant and other persons took their places.

On June 3, 1903, the plaintiff's attorney sent to the defendant a copy of the contract on which he claims and inquired why the defendant did not take possession of the securities held by the plaintiff for the alleged benefit of the defendant. An investigation of the matter was then made by the defendant and a letter was on June 16 written to the plaintiff in substance denying the validity of the plaintiff's alleged contract. This action was then commenced.

Neither the minutes of the board of directors, the executive committee nor the stockholders of the defendant contain any reference whatever to the guaranty of said notes or to the alleged contract with the plaintiff. It appears beyond controversy that no resolution authorizing the execution of the

plaintiff's alleged contract was ever considered or passed by either of said bodies. All of the directors and members of the said executive committee and officers of the defendant that were sworn other than the president and said vice-president testified that they never heard of the plaintiff's claimed agreement until after the letter of June 3, 1903. After September, 1902, the affairs of the defendant were investigated by a committee of its board of directors, and a firm of certified accountants were employed in the fall of 1902 to examine the affairs of the corporation and make a report to its board of directors, and in neither case did they find the alleged agreement which it is asserted was left with said vice-president, nor were they informed, nor did they ascertain in any manner whatsoever, that there was such an alleged outstanding agreement. The explanation of the president and said vice-president is that they and each of them did not suppose that the agreement was binding upon the defendant because of the failure to obtain the assent of all of the outstanding holders of bonds and stocks of the shipbuilding company to such pooling agreement. It is also true, as appears from the record, that the proposed pooling agreement which we have quoted herein was never signed by all of the holders of the stocks and bonds and never became or was recognized as an effective agreement between the bond and stockholders of said shipbuilding company, and said bonds and stocks were not kept from the open market or a minimum selling price therefor maintained.

Under the circumstances that we have disclosed we return to the question as to whether the execution of the alleged agreement with the plaintiff was within the authority of the defendant, and also whether such vice-president had authority to execute said agreement even if the defendant had authority to enter into it.

What was the purpose of the alleged agreement with the plaintiff? It was not that the defendant should become the purchaser of such bonds and stock, but it was to bring the plaintiff into the pooling agreement to protect the price

thereof.   Both parties to said agreement promised to co-oper-
ate with the syndicate, and it was by the express terms of
said agreement intended as an aid to the syndicate agreement.
The defendant was not to profit directly by the sale of the
plaintiff's bonds and stock in any event.   It had no direct
interest in the said agreement.   The defendant to induce
the plaintiff to enter into the agreement guaranteed at a min-
imum price within a specified time " the sale of all of his said
securities   *   *   *   whether through the efforts of said
syndicate or otherwise."

The defendant did not at any time become the owner of
the bonds and stocks but the guarantor of a " future " and
in substance of the prosperity and success of the shipbuilding
company.   It was a reckless and most unusual and hazardous
agreement.

The purposes of the defendant's organization are very
material in determining the question as to its authority to
make the alleged agreement.   Where a corporation is organ-
ized for business or trading purposes and the only persons
interested therein other than its business creditors are its
stockholders and their only interest therein is to secure
dividends upon their investment, the question of *ultra vires*
is of comparatively small importance except in behalf of the
people of the state in their public capacity, and the courts treat
the question as it relates to such a corporation very differently
than they do in the case of a banking corporation.   (*Hess* v.
*Sloane,* 66 App. Div. 522; affd. on opinion below, 173 N. Y.
616.)   A banking corporation occupies a different relation to
the public in that it invites individuals to submit to it the pos-
session and care of their money and property.   All banking
institutions occupy a fiduciary position.   We have herein
quoted the statutory definition of that form of a banking
institution known as a trust company, and the statutory state-
ment of its powers and the purposes of its organization.
Such powers and purposes are primarily fiduciary.   Their
primary work is of a trust capacity and to a large extent they
take the place of individual administrators, executors, guar-

dians, committees, receivers and trustees. They receive appointment from the courts in trust capacities without giving a bond. It is assumed that the statutory restriction and regulation of their powers will make the execution of a bond in each particular instance unnecessary.

The courts, in considering the effect of *ultra vires* acts, have always recognized the distinction between business and trading corporations and corporations whose purposes are largely fiduciary.

In *Leavitt* v. *Yates* (4 Edw. Ch. 134, 156) the court, referring to a banking corporation, say : " They can have no right or power to borrow money or contract for loans to enable them to engage in speculations, or in mercantile or other business having no sort of relation to and forming no part of the ordinary business of a bank.  *  *  *  The unauthorized acts of agents are not binding on their principals; and directors are but agents or ministers, intrusted with powers to be exercised for the benefit of others. Those who have contributed to the formation of a banking capital by becoming shareholders; those who have intrusted their money on deposit, or have otherwise fairly become creditors of a bank, are entitled to protection against any unauthorized assumption of powers by the directors, or any misapplication of the assets or funds of the institution. Its property cannot be diverted to other purposes, or be used up in speculations foreign to the business of banking without a struggle for its recovery and an effort to reclaim it. A rigid adherence to this principle works no injustice, although it may sometimes produce a seeming hardship. Persons dealing with corporations or associations of limited capacity, must look to the character of the transactions they engage in with them. The law under which they act, and the business they are authorized to perform, is all written in the public statute book, with which every man is supposed to be acquainted."

In *Nassau Bank* v. *Jones* (95 N. Y. 115, 120) this court, referring to a contract relating to the subscription to the stock of a railroad corporation, say : " Even a cursory view of the pro-

visions of the statute under which the plaintiff was organized, and the cases giving construction to the powers thereby conferred, renders it quite clear, that the contract under which the plaintiff claims was not only *ultra vires*, but contrary to public policy.  \*  \*  \*   The solvency of these institutions was guarded by special provisions and limitations in the act authorizing their incorporation, and has ever since been the object of sedulous care, both on the part of the legislature and of the courts.   (Laws of 1837, chap. 360; Laws of 1854, chap. 329; Laws of 1862, chap. 62.)   The language employed in the act defines their power and duties, and excludes by necessary implication a capacity to carry on any other business than that of banking, and the adoption of any other methods for the prosecution of such business than those specially pointed out by the statute.   (*Pratt* v. *Short*, 79 N. Y. 440; Morse on Banking, 5; *Talmage* v. *Pell*, 7 N. Y. 347; *People* v. *Utica Ins. Co.*, 15 Johns. 383.)  \*  \*  \*   The spirit of the law, as well as a sound public policy, forbid these institutions from risking the moneys intrusted to their care in doubtful speculations or enterprises."

" There can be no doubt that speculative contracts entered into for the sale of stock by the bank at the stock board, or elsewhere, subject to the hazard and contingencies of gain or loss, would be *ultra vires*, and a gross perversion of the powers conferred by its charter.   But the bank, as the owner of stock, could sell it, as any other owner of similar property, and could employ a broker to sell it at the board."   (*Sistare* v. *Best*, 88 N. Y. 527, 533.)

" Speculative contracts entered into for the sale or purchase of stock or other property by a savings bank at the stock board or elsewhere, subject to the hazard and contingency of gain or loss, unless authorized by its charter, are *ultra vires*."  (*Jemison* v. *Citizens' S. Bank*, 122 N. Y. 135.)

The legislature intended and the public interests demand that trust companies shall be confined not only within the words but also within the spirit of the statutory provision which declares that a corporation shall not possess or exercise

any corporate powers not given by law or not necessary to the exercise of the powers so given. Such authority does not permit a trust company to enter into speculative and uncertain schemes or unless under peculiar circumstances not disclosed in this case, become the guarantor of the indebtedness or business of others. Its authority to buy and sell stocks and bonds does not authorize it to indulge in hazardous promoting schemes although it may hope from the successful launching of such schemes to make large commissions and receive large bonuses.. We have already referred to the case of *Appleton* v. *Citizens' Central Nat. Bank,* in which this court has illustrated the effect of different circumstances in determining the legality of particular acts.

The guaranty of said notes in this case, as well as the alleged guaranty to the plaintiff, was without any legitimate or adequate basis. Its president, as stated, assumed that there was no risk in what he did and directed, and he was doubtless influenced by a sentimental reason arising from the extent to which the defendant had been connected with the general scheme of floating the shipbuilding company. It did, however, create a hazard so great as to involve the very life of the defendant, and in our judgment it was wholly without authority. The result of such hazardous and reckless dealings and acts by the officers of trust companies is well illustrated in this case, as it appears that the defendant was organized with a large capital and paid in surplus in the spring of 1902, and within a few months thereafter was shorn of its surplus and compelled to reduce its stock to a small part of the original issue, and it has still upon its hands this serious litigation. If such business methods are authorized by statute and approved by the courts the purpose of the organization of trust companies would fail and result in a trap to those invited by the legislature to submit to such corporations their fiduciary accounts.

It is claimed by the plaintiff that under the doctrine established in this state the defendant is liable notwithstanding its acts were beyond its corporate authority by reason of the fact

that it has by the agreement with the plaintiff secured to itself a benefit, and the plaintiff has performed his part of the agreement. As we have shown, the alleged agreement was not only outside of its corporate powers, but it was signed by its vice-president without the authority of its board of directors, and the seal was attached thereto without any statutory or other authority. Although the presence of a seal upon an instrument is *prima facie* proof that it was attached by proper authority (*Quackenboss* v. *Globe & R. F. Ins. Co.*, 177 N. Y. 71) it is only such proof as may be conclusively rebutted, and it has been conclusively rebutted in this case.

The plaintiff has never given to the defendant any concrete thing by virtue of the agreement. The bonds and stock mentioned in said agreement were never accepted by the defendant. The plaintiff has at most refrained from selling his bonds and stock and held himself in readiness to deliver the same to the defendant. During all of the time that he waited he knew, or should have known, that the defendant was not obligated to perform the alleged contract on its part. This action is simply to recover damages for such alleged breach of a writing signed without power in the corporation or authority in the officers who signed its name thereto. The doctrine sought to be invoked by the plaintiff in this case is not applicable.

There is another reason why the plaintiff cannot recover in this case and that is that it appears from a reading of the alleged agreement apart from the testimony of witnesses that it is dependent upon the co-operation of the syndicate agreement. The plaintiff owned but a comparatively small portion of the bonds and stocks that had been issued by the shipbuilding company. The futility of the alleged agreement apart from the general pooling or syndicate agreement is apparent from a mere statement of the facts. The alleged agreement with the plaintiff was intended to co-operate with the syndicate agreement. It was to terminate before the time therein specifically mentioned on the termination of said syndicate

agreement. The purpose and consideration of the agreement was wholly dependent upon the existence of a syndicate agreement which, as stated in the recital therein, provided for the deposit of all of the outstanding shipbuilding securities. The syndicate agreement was not consummated and the shipbuilding securities were sold at auction upon the market from time to time during the year mentioned. It is impossible to assume that such agreement was signed except as expressly stated therein for the purpose of an aid to a syndicate agreement then executed or subsequently to be executed. The alleged agreement was so dependent upon the existence of such syndicate agreement as to fail wholly without it. In view of the fact that the syndicate agreement was not consummated or its provisions carried out, the defendant did not obtain any advantage from or consideration for the alleged agreement with the plaintiff.

The judgment should be affirmed, with costs.

CULLEN, Ch. J., EDWARD T. BARTLETT, HAIGHT and VANN, JJ., concur; GRAY and WILLARD BARTLETT, JJ., absent.

Judgment affirmed.