G. FRANK DOUGHERTY and Others, Plaintiffs, *v.* THE EQUITABLE
   LIFE ASSURANCE SOCIETY OF THE UNITED STATES, Defendant,
   and Twenty-five Other Cases.

Supreme Court, New York County, February 3, 1932; supplemental opinion,
June 11, 1932.

*Engelhard, Pollak, Pitcher & Stern* [*Walter H. Pollak, G. Frank Dougherty* and *George J. Hadjinoff* of counsel], for the plaintiffs.

*Davis, Polk, Wardwell, Gardiner & Reed* [*John W. Davis, William C. Cannon, David E. Hudson* and *Edward C. McLean* of counsel], for the defendant.

WILLIAM S. ANDREWS, Official Referee. The defendant is incorporated under the laws of New York as a mutual association to engage in the business of life insurance. It issues policies of, at least, three kinds — ordinary life, twenty payment life and endowment. The nature of ordinary life policies needs no explanation. Twenty payment life policies (the years may be more or less) required the payment of premiums for the time fixed only if the insured survived so long. Upon his death, before or after, the policy matured. Endowment policies also required the payment of premiums for a fixed period. If he died earlier, the policy matured. If he survived, the policy matured at the end of the period agreed upon.

In 1871 the Imperial Russian government decided to allow foreign insurance companies to do business within the empire. A general law was enacted imposing certain conditions. Among other things, a company desiring to enter the country was required to obtain a special concession or charter.

In 1889 the defendant applied for such a concession. In 1890 came the law of that year which, together with the decree of 1871, was to govern the operations of the defendant in Russia. This law was amended in 1897, and other amendments, immaterial here, were also made from time to time. This is the so-called " Pravila " or policy rules, and it was to be inserted in and become a part of every policy issued.

This concession might at any time be canceled at the discretion of the government without explanation. If withdrawn, the defendant " must immately liquidate its business in Russia and settle its accounts with the assured in the manner that shall be indicated to it by the Russian government."

Many conditions were imposed. Deposits were to be made in the Russian State Bank to guarantee the insured against losses and " to serve exclusively as a guaranty of the society's liabilities on assurances made in Russia." They could not be reached by foreign creditors, nor could any part be withdrawn without the consent of the government. The fulfillment of the defendant's obligations to the Russian insured was also " guaranteed * * * by all the property belonging to the Society." The defendant is to be amenable to the laws of the empire having reference to its business, and likewise to all future laws. In somewhat different language the law of 1871 had provided that foreign insurance companies " in their transactions shall abide by the existing enactments in Russia and those which may be issued in the future."

To conduct its Russian business a special responsible agency was to be established in Russia and at St. Petersburg and a general manager for Russia appointed who shall reside there. This manager is to be given wide but defined powers. Among other things he was to furnish various reports and statements to the government and to publish reports both of the general and of the Russian operations of the society. All operations were to be effected in " Russian credit value "— meaning the paper ruble, first based on silver and after 1897 on gold. Further, " all disputes which may arise in connection with the insurance operations * * * shall be settled according to the Russian laws and in Russian courts of justice."

The manager may appoint local agents in Russia. One wishing insurance applies to him or to one of these agents. If satisfied the manager recommends the risk. Final acceptance, however, depends upon the decision of the home office in New York. If that is favorable a policy of the defendant in the Russian language is prepared. It must bear the signature of the president (or vice-president) of the defendant in New York and must be then counter-signed by the Russian manager. When delivered to the insured in Russia it becomes effective.

Annual, semi-annual or quarterly premiums are to be paid in advance on the date when they fall due, by the insured in Russia and in Russian currency. If he fails to do so, he may make payments within two months thereafter with interest at six per cent on the premium for the time overdue. But on the first day of the third month if still no payment is made the policy lapses and becomes null and void. No premium payment to an agent will be recognized unless a receipt, signed by the general manager, is given.

Having obtained his policy the insured is entitled to share in dividends paid by the defendant if the premium for the preceding

year has been paid. How he shall share depends upon notice of his decision between certain options given to the manager or to a local agent. In some cases the insured may vote for the directors of the defendant. Should default in premium payments occur, if the insured has paid not less than three annual premiums, two choices are given him. Within fourteen months of the last due date, he may give notice to the general manager of his desire to receive the surrender value of the policy, and payment of this amount is made upon the surrender of the policy and the last premium receipt to the manager at St. Petersburg. Or he may, upon a like notice given within eight months of the last premium date, and a like surrender of the policy and receipt, obtain a paid-up policy in a reduced amount.

When a policy matures the defendant promises to pay the insured or his beneficiary a certain number of rubles, either by the manager at St. Petersburg, or by transmitting the amount direct to the beneficiary. Evidently the design is to care for those beneficiaries who do not reside at a convenient distance from St. Petersburg and is an alternative method of payment which may be adopted by the manager. But whether the policy is payable at death or is an endowment policy the amount promised is payable by the defendant when various notices and documents have been presented to the manager at St. Petersburg. Notice of loss of a policy is given to the same manager at the same place.

Lastly, " if through any reason, not the fault of the Society, the beneficiary fails to receive the amount of the assurance and profits within a reasonable time, the Society will pay no interest for such delay."

In the same year that the Pravila was adopted, provision was made for loans to the insured, and these loans were further regulated in 1903.

The result of these various provisions is that these policies were made in Russia and were to be performed there. All payments to the defendant were to be made in Russian currency. What the insured or his beneficiary were to receive was the sum promised in Russian rubles. Primarily they were to be paid from funds accumulated in St. Petersburg for that purpose. Only if such funds proved insufficient or if for some reason payment could not or was not there made might recourse be had to the general assets of the society, by which the Russian obligations of the defendant were guaranteed.

Doing all things necessary to permit it to act, the defendant began its Russian business. Among others, between 1890 and 1911 it issued the twenty-seven policies involved in the present litigation.

Some were unsealed. Some bore an impression on wafer or on paper, bearing in the Russian language the legend " Equitable Life Assurance Society of the United States in New York. Chief Management for the Russian Empire." This seal was in the St. Petersburg office of the defendant and when used was there placed upon the policies by its representatives. It should be noted that where the printed translation before me states that attached is the seal of the defendant, it is conceded to be an error. Wherever a seal is said to be attached to a policy it is always such a seal as has been described.

In 1914 came the great war. Thereafter the defendant issued no new policies in Russia. The Imperial government was overthrown in March, 1917 and was followed by the Kerensky government, which was recognized by us. In turn overthrown, the Soviet government seized power on November 7, 1917. Almost immediately it abolished all existing courts, substituting for them " courts constituted on the basis of democratic elections " which " shall abide * * * by the laws of the " overthrown governments to the extent only that such laws were not abolished by the revolution and are not in conflict with revolutionary conscience and the revolutionary interpretation of the laws. Although unrecognized by us, as a matter of fact it soon obtained complete authority in its own country. This new government on March 3, 1918, entered into the treaty of Brest-Litovsk with Germany. Thereby it renounced its sovereignty over Esthonia, Livonia, Courland and Lithuania, and former Russian citizens residing in these countries became citizens of the new governments there established, which governments have been recognized by the United States. Warsaw was then occupied by Germany, and Poland later was recognized as independent.

In November came a second decree as to the courts. They are to apply the decrees of the government. If such be absent or insufficient they are to be guided " by the socialistic sense of justice." It was not until 1923 that anything resembling ordinary courts were re-established, but even then they were not allowed to consider controversies arising out of civil relationship which originated prior to November 7, 1917.

Meanwhile the Soviet government evidently contemplated the continuance of existing private insurance companies. So on March 23, 1918, a Soviet on insurance affairs was created to investigate all applications for permission to conduct the business. But there came a change and the so-called monopolization decree was published on December 1, 1918, effective from the date of publication. Insurance of all kinds was declared a State monopoly. All private

insurance companies were to be subject to liquidation and became State property. Anything that remained after liquidation became also State property absolutely.

For two weeks Mr. Schoofs, the general manager, and his staff returned to its offices in St. Petersburg. Apparently they transacted no business. Certainly nothing was paid out to policyholders. Nor does he claim to have sent out notices, nor to have received notices or premium payments on behalf of the society. Indeed he could not. Our knowledge of historical facts is sufficient to inform us as to what would have happened to him if he had attempted to defy the Soviet decree. Equally impossible would it have been for a policyholder to pay him premiums or to give him notices on behalf of the defendant.

On December fourteenth the offices of the defendant were closed by the government and the doors sealed. On December twenty-fourth a so-called government liquidator appeared, took physical possession and seized all books and papers. For nearly a year he and his successors carried on business as liquidators. They sent out notices calling for premiums, and in some cases received payments, signing notices and receipts, at least generally, as liquidators. But they paid no claims.

As has been said, in some cases policyholders, after December 1, 1918, paid certain premiums on their policies to the liquidator. There is no indication that by so doing they intended to or in fact did accept the Soviet government as a debtor in regard to any claims they may have had against the defendant, or to release it from any obligations it may have incurred.

As a result of the decree mentioned the government seized and confiscated all the assets of the defendant in Russia. In March, 1919, a second decree released State concerns from the payment to private persons of all debts arising before the nationalization of companies. Meanwhile all transfers of money in Russia either by way of premium payments or payments of claims were forbidden. Then, on November 18, 1919, a decree abolished life insurance in all its forms and all former enactments or decrees pertaining to the subject. It annulled all contracts in regard thereto, and it transferred all premiums paid to the treasury.

The defendant ceased to do business in Russia after December 1, 1918. All its property there was confiscated. If the insured might not give notices or pay premiums in St. Petersburg (or Petrograd or Leningrad) neither might the defendant fulfill its obligations there.

With this condition confronting it, on or about January 1, 1920,

the defendant wrote off upon its books all reference to the Russian business, both assets and liabilities. It refused to be liable upon any of its Russian policies. It remitted all claims of policyholders to the Russian government for possible settlement. It was a cancellation or rescission, so far as concerned its Russian obligations and a rescission of its Russian policies. But, except in one instance, no notice of this action was given to or came to the attention of Russian policyholders until much later.

This action was illegal. The defendant could not so relieve itself of its contractual liabilities. But I do not stigmatize it as wanton or willful. The situation was unusual and confusing. Advice was given by Superintendents of Insurance in the United States. Other companies took the same course. I think the defendant acted in good faith, but mistakenly and wrongfully.

At some undetermined time after December 1, 1918, many of the insured involved in this litigation emigrated from Russia. Thereby, if Soviet decrees are to govern, they lost their Russian citizenship. Probably, in contemplation of our law, this is not so. I regard this matter, however, as immaterial. The suggestion that whatever the result as to aliens, the Soviet decrees were effective as to Russian citizens, has no support. Such a claim was made in *Sliosberg* v. *New York Life Insurance Company* (244 N. Y. 482), but was not approved, although it may be said the question was not fairly involved in that case.

In the twenty-six cases before me various situations must be considered. All of the plaintiffs obtained policies with the defendant during the Imperial regime. By the action of the company, as has been said, liability on all of them was denied on January 1, 1920. Some of these policies were plain life policies, where the insured is sometimes still living and sometimes dead. Some are endowment policies where the endowment period has expired and some where it has not. Some are life policies where premiums are to be paid for a limited period. Some bear a seal with the impression I have indicated, and some do not. In some cases the policy is absent. Some are issued to those now citizens of Russia. Some to those who since the Brest-Litovsk treaty have become citizens of independent nations. One to a citizen of Germany and one to a citizen of the United States. But in each case the promise of the company is to pay to the insured when his policy matures a certain sum in " Russian credit currency " at St. Petersburg in return for an annual premium paid there in the same currency, and upon the filing in St. Petersburg of certain notices and documents. In all except five it is admitted that premium payments were made carrying the policy at least to December 14, 1918. In

none, where death has occurred or where the endowment period has expired, were any notices or proofs filed in St. Petersburg or elsewhere. Upon none has any final payment been made by the defendant.

Mr. Dougherty and Mr. Pinkussohn bring the actions standing in their names as assignees of those claiming to be entitled to benefits under these various policies.

In three of these actions (Dougherty, Nos. 28 and 47, and Pinkussohn, No. 112) recovery is sought for the face amount promised at death or at the end of the endowment period or for a paid-up policy as of the date of the last premium payment. The twenty-three others are for the return of the premiums paid, with interest on each payment from the time it was made. All of the complaints are based on the action of the defendant on January 1, 1920. In all the failure to pay any later premiums if due, or to serve any notices or documents required by the policies after December 1, 1918, is sought to be excused because of the condition of affairs in St. Petersburg. It is further alleged that at all times material here, the exchange value of the ruble was $0.5146.

The answers, with some admissions, deny the allegations of the complaint and especially the exchange value of the ruble. It then sets up certain affirmative defenses:

*First.* The decree of December 1, 1918, which provided for the liquidation of the defendant's Russian business and discharging it from all further liability therefor, and the assumption of liability by the government.

*Second.* The decree of November 18, 1919, canceling all insurance contracts in Russia, and transferring to the State all assets of the society.

*Third.* The failure of the insured to comply with conditions precedent contained in the policy.

*Fourth.* The plaintiffs can maintain no action here but only in Russian courts and under Russian laws.

*Fifth.* The actions of the revolutionaries in Russia making performance of the contract impossible by superior force, under the Russian law excused the defendant from performing its contract.

*Sixth.* A partial defense — much the same as the fifth, except that the various contracts were suspended until they became impossible of performance or purposeless.

*Seventh.* Under the Russian law when the performance of a contract becomes useless or valueless the parties are excused from performance. The decree of July 17, 1914, prohibiting the exchange of paper rubles for gold and the later fact that these rubles became valueless had that effect.

*Eighth.* The decrees of June, 1917, and September and October, 1918, prohibiting the transfer of money from Russia without the consent of the government, which has never been obtained, have the same effect.

*Ninth.* The Russian ten-year Statute of Limitations.

*Tenth.* The New York six-year Statute of Limitations.

*Eleventh.* The assignments fail to comply with the Russian law and the policy rules.

Certain of these defenses have been considered by the Appellate Division in a review of the pleadings in two cases (*Dougherty* v. *Equitable Life Assurance Co.*, 228 App. Div. 624). They were Dougherty, No. 4 (Warshavsky) and No. 13 (Laude). Neither policy bore a seal. Both the insured were residents and citizens within the present boundaries of Russia. These defenses were stricken out as insufficient.

Admitting, as the defendant claims, that this decision is not *res adjudicata*, at least in any case except those in which it was actually made, still it is the duty of a referee to follow precedents established by a higher court. Even if, as again claimed, they are wrong or doubtful they must be corrected either in the Appellate Division or in the Court of Appeals. So while not pleaded in precisely the same language, I understand the effect of this decision is to make unavailing the first, fourth, fifth, seventh and eighth defenses. The evidence before me is no broader than the pleadings. The same thing may be said of the sixth defense. It pleads a suspension which terminated long before these actions were begun. It is also to be observed that the result of this decision is that whatever the Russian Imperial or the Soviet law may have been, it is immaterial. Being alleged as a fact, the court refused to allow proof on the subject. (See tenth defense in original answer, appendix to plaintiff's brief, p. 167.)

We have then left the Russian and New York Statutes of Limitations, the question as to the assignment, questions as to compliance with conditions precedent and the defense based on the decree of November, 1919. While not in the pleadings, a further defense was interposed at the hearing without objection. It related to certain regulations of the Federal Reserve Board made in 1919 and abrogated in 1920 prohibiting the exportation or importation of Russian rubles or the transfer of funds for their purchase.

All questions as to the validity of the several assignments have been expressly withdrawn by the defendant. Nor does the action of the Federal Reserve Board seem important. As to the cancellation decree it will not be recognized by our courts. We come, therefore, to a consideration of conditions precedent.

The insured was required to pay his premiums in advance. When his policy matured he was required to give certain notices and documents before he was entitled to make any claim against the defendant. The same requirements faced him if he desired paid-up insurance under the terms of the original policy.

Defendant's general Exhibit 93a shows but five cases where it is claimed that premiums were not paid in full before December 1, 1918. In these cases the insured was Rabinowicz (Dougherty, No. 24), Waskowski (Dougherty, No. 37), Philipp (Pinkussohn, No. 23), Siline (Pinkussohn, No. 60) and Vitkoup. In the Rabinowicz policy the last premium receipt was dated June 15, 1918, and extended the policy to September 15, 1918. In the Waskowski policy the last receipt is dated September 28, 1917, and extended the policy to March 28, 1918. In the Philipp policy the last payment was made on March 4, 1918, and extended the policy to October 9, 1918. In the Siline policy the last payment was made on January 17, 1918, and extended the policy to July 3, 1918. In the Vitkoup policy the last payment was made on September 15, 1917, and extended the policy to October 3, 1917. But, as we have seen, the Pravila provided that in case premiums were not paid on the due date, two months' grace was allowed during which payments might be made. Not until the first day of the third month did the policy become void. Therefore, in the Philipp policy (Pinkussohn, No. 23) payment might still have been paid on December ninth.

The Rabinowicz policy (Dougherty, No. 24) was on the twenty-year endowment plan with premiums payable quarterly. They were paid for nineteen years and nine months, and, as has been said, carried the policy to September 15, 1918. The Pravila, in addition to the clause as to default and two months' grace, also provided that where premiums are payable in quarterly installments, that portion of the yearly premium which may remain unpaid at the maturity of the policy will be considered as an indebtedness to the defendant on the policy and shall be deducted from the amount insured. By non-payment of the quarterly payment due on September fifteenth, therefore, the insured lost no rights. He had the option of deducting the amount then due from the principal when the policy matured on December fifteenth.

In the three other cases, however, the insured were in default on December first. It is true they were still entitled to receive either paid-up insurance or surrender value — one or both. Perhaps they might enforce their contract in that respect had they wished to do so. Instead they chose to consider the contract as rescinded or ended. They have in the cases before me elected their remedy.

(*Kline* v. *Myriad Pictures Corporation*, 211 App. Div. 550; affd., 240 N. Y. 667; *Clark* v. *Kirby*, 243 id. 295; *Norton* v. *Dreyfuss*, 106 id. 90.) They ask only for the return of premiums paid by the insured. This under the circumstances is all they might obtain. Treatment of a contract as rescinded is not allowed to one himself in default. Therefore, the complaint in Dougherty, No. 37, Pinkussohn, No. 60, and Vitkoup must be dismissed.

In the remaining cases, where the policies had matured before December 1, 1918, no proofs were given after that date. In the case where it is claimed that maturity came later proofs also were not given. In no case were premiums paid to the defendant to a date much later. Ordinarily in each case there would have been a default.

Here such a result under the circumstances which have been detailed does not follow. The place of performance was the defendant's office at St. Petersburg. If the performance was required there, the implication was that the place of performance would be maintained. This could not be done. But if the defendant was innocent so were the insured. Neither party might do what was expected when the contract was made. Nor did this impossibility impose a duty upon the insured to seek the defendant in some other place. The defendant would not permit him to do so. It is true that in four cases some premiums were paid to its office in Berlin. But in July, 1918, the German general manager writes to Mr. Fahrbach that connection with the home office is cut off. And while these payments are acknowledged by the defendant, when peace came the same manager wrote to Mr. Suessman that his instructions were that no premiums should be accepted except by the St. Petersburg branch. Mr. Rodkinson attempted to make payments in New York. One was accepted there, but with the warning that all payments are to be made in St. Petersburg in Russian rubles and the society accepts no responsibility except to transmit the premium to the Russian office and is not committed to receive any further premiums outside of Russia, and to an offer on January 3, 1920, to pay premiums at any rate of exchange it might fix, replied in effect by a refusal to accept them. The only result was to excuse the insured from the conditions precedent to the receipt of the money promised him — the allowing the defendant, of course, whatever would have been due had he been able to perform. Possibly had the defendant's office in St. Petersburg been reopened other questions might arise. It never has been. (*Cohen* v. *New York Mutual Life Ins. Co.*, 50 N. Y. 610.)

Lastly, I must consider the Statute of Limitations. They begin to run from the time when the right of relief accrues. (Civ. Prac.

Act, § 11.) Where the cause of action arises without the State in favor of a non-resident, the shorter time prescribed either by our statute or by the statute of the country where it arose governs. (Civ. Prac. Act, § 13.) Here an action upon a sealed instrument must be brought within twenty years (Civ. Prac. Act, § 47); upon a contract obligation, express or implied, within six years (Civ. Prac. Act, § 48). In Russia in either case the time allowed was ten years. If the claimant dies within the time limited, his representative is given an additional year from the death of the claimant. Where no limitation is specifically provided, the action must be begun within ten years. (Civ. Prac. Act, § 53.)

As has been said, many of the policies bore a seal with the legend which has been described. In none of them, however, is there any reference in the document itself to a seal. It is the rule that where under such circumstances what purports to be a seal on a paper where a seal is unnecessary is merely a wafer or a scroll there must be further proof that the party sought to be charged actually affixed the same as his seal. (*Matter of Pirie*, 198 N. Y. 209.) Otherwise there is room for fraud or forgery.

The same rule is not applicable, however, where we find a corporate seal at the end of an instrument. Such a seal adopted by the corporation (Gen. Corp. Law, § 14) raises the presumption that it was attached by the proper authority (*Gause* v. *Commonwealth Trust Company*, 196 N. Y. 134, 157; *Quackenboss* v. *Globe, etc., Insurance Company*, 177 id. 71; *Weeks* v. *Esler*, 143 id. 374; *Brooklyn Public Library* v. *City of New York*, 222 App. Div. 422, 435) and at the proper time. Such a seal is in the possession of the corporation. It must have been attached before the document was delivered to the other party. The danger of forgery is eliminated by the fact that the policy bears the corporate seal of the defendant.

I cannot find, however, that this was the corporate seal adopted by the defendant merely by inspection. Evidently it was not. Nor is there any proof that it was a seal used by it in connection with its Russian business. It was in its office at St. Petersburg and was placed on the policies, which required no seal, by its representatives there. Although not a corporate seal it might be adopted by it in any case or by an officer duly authorized to do so. But I cannot find that Mr. Schoofs or any of his subordinates were given such authority. The general requirement of the Pravila that the Russian general manager should be given power to conduct all operations of the society or to represent it in relation to the assured is not sufficient. I treat all these policies, therefore, as unsealed instruments to which the six-year Statute of Limitations of New York is applicable.

This question is important in but two cases, excluding the three dismissed for breach of a condition precedent. They are Dougherty, No. 28 (Reinin) and Pinkussohn, No. 112 (Taube). Both are brought in affirmance of the contract and seek recovery of what was promised.

Mr. Reinin was a resident of Warsaw. In December, 1897, he obtained a twenty-year endowment policy from the defendant which matured on November 6, 1917. Paying all premiums, and being alive at that date, he became entitled to receive 5,000 rubles upon making at St. Petersburg proper proofs of survivorship. He was also entitled to some additional paid-up insurance. At that time Warsaw was occupied by the German armies. Notwithstanding the treaty of Brest-Litovsk it is said that communication with St. Petersburg was impossible and so continued until after December 1, 1918. I shall assume that to be the fact and that Mr. Reinin was, therefore, excused from complying with the condition as to proofs of survivorship prior to December, 1918, and also thereafter because of conditions in Russia. The suit was begun on February 1, 1927. The recovery sought is for the amount promised in the policy.

Certainly after January 1, 1920, this action might have been maintained in New York. The period of limitation must be computed from the accruing of the right to relief by action. (*Tillman* v. *Guaranty Trust Co.*, 253 N. Y. 295.) Mere ignorance of the facts is generally no excuse for delay. (*N. Y. & Boston Despatch Express Co.* v. *Carroll*, 170 App. Div. 197.) The six-year statute is applicable and the complaint must be dismissed, with costs.

Mr. Taube was a resident of Riga, Latvia, of which country he became a citizen after the treaty of Brest-Litovsk. In 1892, and again in 1902, he obtained two twenty-year life policies both payable on death to a Luise Rahlenbeck, who later became his wife. On the first policy the twenty premiums were paid in full and some additional paid-up insurance was obtained. On the second, after the payment of four yearly premiums, no more were paid and the policy was converted into a paid-up policy.

Mr. Taube was shot on May 22, 1919. No proofs of his death were or could be given at St. Petersburg. Suit was begun on August 27, 1930. The recovery sought is for the amount promised in the two policies.

Again, Mrs. Taube might have begun this action in New York at any time after January 1, 1920. But it is argued here, as in the last two cases, that the cause of action did not accrue at the time when she might have sued, but only at the time when proofs of death were presented. Only then did the defendant become liable.

Perhaps the shortest answer to this proposition is the present

action itself. Proofs have never been filed. This failure to comply with the provisions of the policy is excused. But if an action might be maintained in 1930 so it might have been maintained in 1921. The cause of action, in other words, had accrued.

But even in the ordinary case, where the policy does not limit the time within which proofs of death must be filed and the condition that they be filed is a prerequisite to recovery, the running of the statute may not be suspended indefinitely by the unexcused action of the beneficiary. It cannot be that he may delay twenty or fifty years before his cause of action accrues. Only a reasonable time is given him for this purpose. (37 C. J. 953.) I do not think that the various New York cases cited by the plaintiff are inconsistent with this conclusion. The statute began to run on this theory either from Mr. Taube's death, or from two months thereafter, or from this two months plus a reasonable time. In either case an action brought in 1930 was too late. The complaint must be dismissed, with costs.

The third case where relief based on the affirmance of the contract is sought (Dougherty, No. 47 — Zalberg) raises somewhat different questions.

Mr. Zalberg was a resident of St. Petersburg. He died in Paris on December 27, 1925, to which city he had emigrated at some time before. In 1890 he obtained an ordinary life policy from the defendant, payable to his daughter if she survived him, as she did. His premiums were paid to December 16, 1918, and he obtained some additional paid-up insurance amounting to 126 rubles in 1918. In April, 1928, the daughter assigned all her right, title and interest in the policy to the plaintiff and this action was begun on May 1, 1928.

The policy provided for two options to the insured should premiums be paid for three full years and should then default occur. Within eight months thereafter, if the insured returns his policy to the St. Petersburg office, the society will issue to him a paid-up policy. This policy, if issued, would be payable to the beneficiary named in the original policy. Or within fourteen months, on notice to the general manager at St. Petersburg, he is entitled to receive the surrender value of his policy.

Mr. Zalberg in his lifetime never exercised either of these options. Because of conditions in St. Petersburg the time limit imposed upon them would constitute no defense. In New York he would have had various remedies. If content to treat the failure to pay the premium due on December 16, 1918, as a default, he had the legal right to give notice to the home office at any time of his election. He might then sue for the surrender value of his policy.

Or if he chose the other alternative, he might bring an action in equity to compel the issuance of a paid-up policy. There is nothing to show that at least after January 1, 1920, he was unable to maintain an action in this State.

After his death his daughter did not before the assignment made by her to the plaintiff attempt to make such an election. This assignee it is who in May, 1928, assumes to exercise the option. He claims that a paid-up policy should have been issued in view of the failure to pay the premium of December, 1918. It would have become payable to the daughter on the death of the insured in 1925. Only then did her cause of action arise.

But the option was a personal one, given to the insured. No one can tell how he would have exercised it. He might have preferred the surrender value of the policy payable to him under the express terms of the policy, not to the daughter. He might have preferred a paid-up policy in favor of his daughter. In his mind many personal considerations would influence his decision. Now, after his death, the assignee of the daughter may not choose the alternative most profitable to him.

The Statute of Limitations is not a defense. The equitable cause of action to compel the issuance of a paid-up policy did not accrue earlier than December 16, 1918. The ten-year statute is applicable. In May, 1928, this suit was begun.

It may be that other remedies are open to the plaintiff. Possibly had he asked for such relief he might have been entitled to recover the premiums paid, with interest. While such a cause of action strictly may belong to Mr. Zalberg's estate and has passed to his executor or administrator, in view of the position of the defendant and the stipulation at folio 6099 of the printed record, I understand no such question need be considered. However this may be, for the reason given above no recovery may be allowed. The complaint must be dismissed, with costs.

The remaining cases, and also Dougherty, No. 24 (Rabinowicz), and Pinkussohn, No. 23 (Philipp), may be treated together. In all, as has been said, a recovery is sought for the various premiums paid, with interest from the date of the several payments. In all action was begun from 1925 to 1930. In all it is claimed that as the contracts were repudiated or rescinded by the defendant the plaintiffs are entitled to receive the consideration paid therefor, less any benefits enjoyed by them.

If I fully understand the theory of the plaintiffs in these cases, I do not agree with it. In summing up their counsel says: " We do not as to any of these lawsuits rest upon the action of the directors in 1919 as an anticipatory breach, but we rely in every case upon a

present breach, that is every one of these assured had at the time of bringing suit a present right." That must mean that the contracts were broken at the time the various actions were begun. How? Not by failure to fulfill an implied agreement to maintain an office in St. Petersburg where premiums might be received. If under the circumstances the insured were relieved of the obligation to pay premiums or to give notices there, so was the insurer relieved. Not the refusal to receive premiums, for none were tendered. Not by failure to return premiums and interest when suit was brought. Unless there had been some prior breach of the contract none were due.

We come back to the action of the directors of the defendant on January 1, 1920. That was a declaration that they rescinded and annulled these contracts. And while labels or definitions are unimportant, I prefer to treat that action as an anticipatory breach of the contract so far as the defendant is concerned. And when the plaintiffs by bringing these actions elected to accept the rescission, a recovery became possible.

I disagree, equally, with the defendant that the Statute of Limitations began to run from the date of rescission by it. Until the time notice in some way reached the insured, the rescission or repudiation was not complete, and no cause of action arose. No "ordinary diligence" rule applies. One party need not expect that the other will break his contract. He need not be watchful. He has the right to assume that the contract will be fulfilled, unless he has information to the contrary. And even if applicable generally, the situation here is such that it furnishes no defense in these particular actions. Action by the defendant in New York cannot be fairly held to be known to the insured in Russia or Latvia or Poland. Inquiry could not be made at the Petrograd offices. They were closed.

Notice to the insured was, therefore, required. No mental attitude of the offending party, no communication by him to friends or to servants or to outsiders complete the breach. (*McNamara* v. *Eastman Kodak Company*, 232 N. Y. 18, 26.) Before notice is given and accepted by the insured as an anticipatory breach of the contract, there is room for repentance. Only when that is done does the right of action accrue. (*Wester* v. *Casein Company*, 206 N. Y. 506; *Moore* v. *Maddock*, 251 id. 420; *Frost* v. *Knight*, L. R., 7 Ex. 111; *Starchroom Pub. Co.* v. *Threlkeld Engraving Company*, 13 Ohio App. 281.) In the draft of the Law of Contracts of the American Law Institute, also, an anticipatory breach is said to occur when there is a positive statement to the promisee that the promisor will not perform. And as an illustration is given the case

where the promisor tells a third person of his intention, who in turn tells the promisee what he has heard. Here is no anticipatory breach of the contract. So in *Richard* v. *Credit Suisse* (242 N. Y. 346) it is said " election [to rescind] presupposes knowledge, or at least omission to fulfill some duty of inquiry from which knowledge would have followed."

Of course an election on the part of the promisee to treat the act or statement as an anticipatory breach is necessary (Williston Cont. § 1322), but the bringing of an action is such an election. (*Graves* v. *White*, 87 N. Y. 463.) Probably such an election may be made at any time within six years. (*Richard* v. *Credit Suisse, supra.*) This does not mean that the Statute of Limitations begins to run only from the time election to rescind is made. The right to relief accrues when it might be so made. (Civ. Prac. Act, § 11.) And where an election is once made the plaintiff's rights are fixed.

It would seem, therefore, that as the cause of action accrued not earlier, at least, than the insured received notice of the repudiation, the six-year-Statute of Limitations would begin to run from that date. For the burden of proof as to notice rests on the defendant. The Statute of Limitations affords an affirmative defense. Usually it is for it to prove that the bar affords relief. (*Sands* v. *St. John*, 36 Barb. 628; *Lynch* v. *Lynch*, 89 Hun, 112.) As is stated by Judge LEHMAN (*Maslow* v. *Ageloff*, 100 Misc. 356), " the defendant who sets up the Statute of Limitations is required only to plead and prove that the cause of action did not accrue within the period within which an action may be brought as provided in the statute." Here the defendant has made its plea. It has not proved its allegation.

If this be so, a letter from the defendant during 1925 in Dougherty, No. 25 (Seltzer), may have been notice of rescission, but even so, action was begun in 1926. The same thing is substantially true in Pinkussohn, No. 60 (Silene).

More difficulty arises in the Rodkinson case. Mr. Rodkinson when he obtained his policy in 1903 was a citizen of the United States temporarily residing in Russia. At some time he went to England but in 1920 was in New York. From that place he wrote the defendant asking to be allowed to there pay his premiums. On January 14, 1920, the defendant replied, referring to the Russian situation, and stating, " we cannot in view of existing conditions take any action in connection therewith [the policy] or assume any further responsibility with respect thereto." This letter, produced by the plaintiff, must have been received soon after. Mr. Rodkinson died on March 30, 1927, and suit was begun by his representative on October 1, 1927.

This was ample notice of the decision of the defendant to cancel

or repudiate this policy. The acceptance of the rescission and the bringing of the action must have occurred within six years of that date, or some time in March, 1926. The action is too late and the complaint must be dismissed, with costs.

Except in those cases where the complaint should be dismissed, the plaintiffs may recover. It remains to fix the amounts. As to this there is a sharp dispute, although the general principle is clear. Upon the illegal rescission of a contract the injured party should receive the consideration he has paid, less any benefits he may have received. Here the plaintiffs claim they are to be allowed all premiums paid, measured by the exchange value in New York at the date of the various payments, less any dividends received and any loans made by the defendant to the insured, with interest from the date of the several payments. The defendant claims that any recovery allowed is to be limited to the premium reserve value of the policies in December, 1918, or January 1, 1920, with interest, at the exchange value of the ruble on that date in St. Petersburg. The rule as to the measure of recovery must first be decided.

The important question is whether the plaintiffs received from the defendant any benefit for which they must account owing to the fact that their policies remained in force for twenty years, more or less, before they were canceled. If so, not the total premiums paid, but the premium reserve value fairly represents what the plaintiffs have lost because of the acts of the defendant.

This question is a difficult one. There is no decision of our Court of Appeals directly in point. The decisions of our lower courts are confusing. Decisions elsewhere are in conflict.

Roughly it may be stated that in mutual insurance such as is here involved, the amount of premiums to be paid are based on the law of averages. The expectancy of life of each applicant is calculated. He then is charged a premium that with interest will at least amount on the average to the principal sum promised at the end of the policy period, plus overhead charges, the losses incurred during the year and perhaps some others. This, during the early years of the policy, more than covers the risk incurred by the defendant that he may die prematurely. Out of this premium each year a reserve is accumulated to meet or help meet the principal due at maturity. If the insured dies before the date fixed for his assumed life expectancy, his estate will receive more than the total premiums paid by him. If later, not so much. Each year the expenses of the insurer, including death losses, may be less than was anticipated. The excess of moneys for this reason received by the insurer are distributed in whole or in part among the insured as " dividends." These are the profits on the year's business, distributed among the

"old line" companies to stockholders. One seeking insurance knows at least something of this plan, but probably not all its complicated details. Premiums on all these policies maturing before November or December, 1918, have been paid. Doubtless if any policy had matured before that date, and the required proof had been given, the beneficiary would have received what was promised. Because of that fact the defendant claims that it has lost and the plaintiffs have gained something for which compensation should be allowed.

In New York where a policy is improperly canceled or repudiated the insured has certain remedies. In a court of equity he may ask that his policy be reinstated. He may tender his premium when due, and when the policy matures he may ask for what was then promised. He may accept the act of cancellation by the insurer, and recover the consideration paid, less benefits received. In some jurisdictions upon an anticipatory breach of an insurance contract, he may sue for the damages so caused him.

In this last case the true measure of what he has lost would seem to be, if he is still an insurable risk, the additional amount it will cost him to obtain new insurance in a company of equal standing. If not so insurable, the face of the policy, discounted with regard to the fact that it is not presently payable, less such future premiums as he would probably be called upon to pay.

While a recovery of damages for an anticipatory breach is not allowed here, cases have arisen where the distribution of the assets of an insolvent insurance company is considered. Here our courts have spoken of "reverse value" and "cost of replacement" as synonymous. One such case is *People* v. *Security Life Ins. & Annuity Co.* (78 N. Y. 114). And this is the defendant's claim — that the "reserve value" of these policies in fact represents the value of the premiums paid less the cost of carrying the insurance.

As to whether this "cost of carrying the insurance" or this "value of protection" in actions for rescission is to be returned by the insured, I have, as has been said, found no direct authority in the Court of Appeals. A detailed analysis of the cases to which I have been referred would not be profitable. *Fisher* v. *Hope Mut. Life Ins. Co.* (69 N. Y. 161) is an action to recover damages for a breach of a contract. So is *Toplitz* v. *Bauer* (161 N. Y. 325). Other cases are where the insurance company, being insolvent, has broken its contract. Damages are sought from the insurer. An instance is *People* v. *Security Life Ins. & Annuity Co.* (78 N. Y. 114).

There is, however, a line of cases that, while arising under different circumstances, seem to be in point and to indicate the rule we should adopt. An action is brought to rescind a contract because of the

fraud of the insurer. Such a contract is not void but voidable at the election of the injured party. If upon discovery of the fraud he fails to act, he may no longer rescind. If before rescission the policy matures, his beneficiary may recover what has been promised. So as here, the " risk attaches " until rescission is made. Yet when he does rescind he may recover in full all premiums paid on the faith of the fraudulent contract, although in such an action, also, rescission involves the return of all benefits received. (*Mc Namara* v. *Eastman Kodak Company*, 232 N. Y. 18, 24.) And in either case rescission is based on the idea that the contract is voidable from its inception. Otherwise a recovery could be had but for payments made after the rescission occurred. (*Rohrschneider* v. *Knickerbocker Life Ins. Co.*, 76 N. Y. 216.)

Nor are cases in the Appellate Division more helpful. In some the proper rule of damages is left to be determined on the trial. (*Sliosberg* v. *New York Life Insurance Company*, 217 App. Div. 685.) Others deal with claims for damages. (*Speer* v. *Insurance Company*, 36 Hun, 322; *Keyser* v. *Mut. Res., etc., Assn.*, 60 App. Div. 297; *Farley* v. *Union Mut. Life Ins. Co.*, 41 Hun, 303; *McElwain* v. *Metropolitan Life Ins. Co.*, 50 App. Div. 63.) One case seems to hint that a recovery of all premiums should be allowed (*Dougherty* v. *New York Life Ins. Co.*, 223 App. Div. 843). In still another case (*Moore* v. *Mut. Res., etc., Assn.*, 121 App. Div. 335) the rescission was based on fraud, but the court discusses the theory of " protection." In a dissenting opinion, holding " protection " of value, Mr. Justice KELLOGG points out that the policy in suit differs from ordinary life policies. It was merely temporary insurance. It provides for bimonthly term insurance, he says, renewable at the option of the member. For each two months the insured obtained that for which he bargained. Apparently as to a policy in the ordinary form he would not have disagreed with the opinion of the court.

In the lower courts various rules may be found. It would not again be profitable to attempt to analyze them.

Some comment relating to the subject is made in four cases in the United States Supreme Court. *Lovell* v. *St. Louis Mut. Insurance Company* (111 U. S. 264) in effect discusses the rule of damages. *New York Life Ins. Co.* v. *Statham* (93 U. S. 24); *Supreme Lodge, Knights of Pythias* v. *Mims* (241 id. 574), and *Supreme Council* v. *Behrend* (247 id. 394) are so different in the circumstances involved that no general rule can be inferred even where what is said is a dictum.

In the courts of other jurisdictions the authorities are again at variance. One view is fairly expressed in *Black* v. *Supreme Council, American Legion* (120 Fed. 580; affd., 123 id. 650). The other

is *Mutual Reserve Fund Life Association* v. *Ferrenback* (144 Fed. 342), although here there seems some confusion between recovery as damages and recovery where the basis of the action is rescission. In view of the existing confusion and in the absence of controlling authority in New York, I am free to reach such a decision as seems just.

Where then a policy is repudiated without right, is it any partial defense to say, " if the policy had matured before cancellation you would have been paid? " This is not an agreement to insure for six months or a year in return for the premium, renewable for another six months or another year upon the payment of another premium, a form of insurance which the defendant was authorized to write in Russia. It is a single contract to do a certain thing on a certain contingency. " The annual premiums are not the consideration of insurance for the year in which they are paid; for they are equal in amount, whereas the risk in the early years of life is much less than in the later." (*People* v. *Security Life Ins. & Annuity Co.*, 78 N. Y. 114, 126.) " This is not insurance from year to year. The premiums constitute an annuity, the whole of which is the consideration for the entire assurance for life. " Each instalment is, in fact, part consideration of the entire insurance for life. * * * There is no proper relation between the annual premium and the risk of assurance for the year in which it is paid." (*New York Life Ins. Co.* v. *Statham*, 93 U. S. 24.) Is not the claim in effect that the society may rewrite its contract at will; may alter life to term insurance, probably obtainable for a lesser premium; may end the term when the risk is greatest and when perhaps reinsurance is impossible?

We have here a clear, unambiguous contract. The defendant agrees to pay a fixed amount, at a time, uncertain it is true, but sure to arrive. The insured A in 1908 is in poor health. Probably he will die within a year. B is strong and vigorous. What is the value of the risk carried for the year? Is it the same? To an insurance company, carrying thousands of risks, and counting upon the law of averages, the question may be immaterial. Not so to a single insured, relying upon his individual contract. How the company will accumulate the funds necessary to pay his beneficiary when the policy matures, few know. How complicated the business is the evidence of the adjusters show. Meanwhile the insured receives nothing. He is protected in the sense that any one entering into an executory contract is protected until the contract is rescinded. If, as has been suggested, the " protection " is something of value which he has received and which he must return before rescission, then what the value is depends upon his health during each year.

A clause in the Pravila possibly gives some aid in this matter. If an applicant is desirous of obtaining immediate insurance before his application is accepted or rejected by the main office in New York there may be issued to him on payment of the first premium in full with government dues and policy fee a temporary policy for ninety days. If then there comes a rejection from New York, the insured receives the full amount of the premium paid by him. There is no charge for the cost of insurance or protection during the existence of the temporary policy.

In Russian imperial law, even if important, the rule of New York seems to prevail. On rescission, the insured may recover the consideration paid minus the counter value he has received. I find no satisfactory evidence defining this counter value in life insurance cases. Therefore, in any event, our law is applicable.

I, therefore, hold that the plaintiffs received no benefits from the defendant for so-called " protection " for which allowance should be made, but are to be returned their various premiums.

This being so, there is a dispute whether interest should be allowed. Claimed by the plaintiffs, the defendant argues that under both the Russian imperial law (which it says should be applied) and the law of New York " when a contract is terminated by impossibility or by a rescission for defendant's non-performance, interest runs only from the date of termination of the contract."

I need not discuss the rule where impossibility exists. The effect of the decision of the Appellate Division is to hold that here was no impossibility of performance.

As to rescission where because of the illegal acts of the defendant, recovery is sought for the consideration paid by the plaintiff, the law of New York is now clear. The defendant cites *American District Telegraph Company* v. *City of New York* (213 App. Div. 578), decided in 1925, where a contract was held voidable for duress, and interest was allowed on the consideration paid only from the date of demand. But although the Court of Appeals has said (*Parker* v. *Hoppe*, 257 N. Y. 333) that the form of action termed a rescission is really one for money had and received when the defendant completely fails to perform his contract, and is simply an alternative remedy where the contract is repudiated, yet it also says that interest on a consideration paid " is to be computed from the time of payment." So in *Richard* v. *Credit Suisse*, a motion for summary judgment was made and granted, allowing interest from the date consideration for a rescinded contract was paid. In affirming this judgment the Court of Appeals expressly affirmed this ruling.

In Russia, I must find that the same rule prevails, where a con-

tract is illegally repudiated. Otherwise an opportunity exists for unjust enrichment. And we are told, in the " Pravila " of 1897, that where through any reason not the fault of the defendant, the beneficiary fails to receive the amount of the insurance and profits within a reasonable time, no interest for the delay is due. It follows that interest is due if the delay is the society's fault.

As to the rate of interest I need not decide, even might I do so, whether the New York or the Russian law controls. In both jurisdictions the rate is the same. Nor need I decide whether the Russian law differs from ours as to the date from which interest is to be computed. As a fact I cannot find that defendant has shown such a difference where a contract has been wrongfully repudiated.

Allowed to recover premiums paid with interest less dividends received and loans, when and where is the value of the ruble in our money to be measured? As to when, clearly when the rescission became effective. (*Hoppe* v. *Russo-Asiatic Bank*, 235 N. Y. 37; *Parker* v. *Hoppe*, 257 id. 333.) True the case in 235 New York speaks only of actions to recover damages, liquidated or unliquidated, for breach of contract or for a tort. It is equally applicable to actions brought to recover the consideration when a contract is rescinded.

In discussing this question in regard to the Statute of Limitations I have held that this occurred at least when the plaintiffs had notice or perhaps with the use of reasonable diligence should have known that the defendant had rescinded the contracts. I have also held that under the evidence before me this date must be fixed as the date when the various actions were begun — from 1925 to 1930.

As to where the exchange value of the ruble is to be calculated, the rate at St. Petersburg is to govern. The contracts were made there. There premiums were paid. There the insured were promised payment in rubles. Only if they failed to receive payment there might they resort to the general assets of the society. Had they sued in Russia, as would ordinarily have been the case, they would have been paid in rubles. What the plaintiffs should receive is the value of the rubles which would have been given them by the courts of Russia, if they had been functioning, measured by the rate of exchange at the time they were entitled thereto. " His damages are to be measured according to the value of rubles, as of that date [the date of the breach of the contract] in Petrograd measured in dollars in New York city, where he has sought his remedy." (*Sokoloff* v. *National City Bank*, 250 N. Y. 69; *Parker* v. *Hoppe*, 257 id. 333.)

Even if the Court of Appeals did not decide the question, and if

the sentence quoted may bear more than one interpretation, I am controlled by *Richard* v. *National City Bank* (231 App. Div. 559).

But this question is comparatively unimportant, for I think, as is said later, the exchange value of the ruble in New York and in St. Petersburg from 1925 to 1930 was the same. What then was this value in the latter place between these dates.

Beginning with 1889 credit rubles were based on silver and were worth about fifty cents in our money. At the time they were legal tender. In 1897 the ruble was placed upon a gold basis, having an exchange value of 0.5146. Payments to and from the defendant were made in credit rubles of those kinds. The exchange value of the ruble did not vary until 1914. Then it declined steadily. From March to November, 1917, under the Kerensky government, new issues of State credit notes were made and treasury notes issued — all legal tender and circulating with the old imperial rubles.

When the Soviet government came into power it at first continued the existing money. But in May, 1919, it authorized an unlimited issue of credit notes " of the 1918 pattern " which were to circulate with the existing currency. Other issues were later authorized, to circulate in the same manner.

In November, 1921, however, a decree ordered the issue of a new pattern of note called " money tokens of the 1922 pattern "— one ruble of the new issue to be equal to 10,000 rubles of earlier patterns and to circulate with them at that rate. In October, 1922, there was ordered the issue of a new 1923 pattern ruble, each to be equal to 100 rubles of the 1922 issue. The decrees of June and September, 1922, forbade the further issue of old money and ordered that all rubles issued prior to 1922 should be changed into notes of that year, and further, that after October 1, 1922, earlier notes ceased to be legal tender.

In August, 1923, it was ordered that rubles of the 1922 pattern should cease to be currency after October 1, 1923, but would be exchanged for the 1923 pattern at the rate of 100 for 1. Thus the earlier rubles became practically worthless — even those of the 1922 pattern. It was frank repudiation by the government of its obligations. But on December first, by a government resolution, it was provided that the payment of bills of exchange (their price indicated in gold computation) should be in Soviet tokens at the official rate of exchange " or in chervonetz in bank notes at their face value."

Then came a change of heart. Probably the government saw that to make purchases, especially abroad, some kind of a stable currency must be established. So in February, 1924, there was established a new pattern " Treasury notes in rubles in gold,"

later changed to " Treasury notes in rubles." These notes were legal tender at their nominal value to the government and to private persons for debts " stipulated in gold rubles." The notes of the 1923 pattern were withdrawn and redeemed at 50,000 rubles of that pattern for one of the new notes. Theoretically, at least, these 1924 notes were based on a large gold reserve and were the sole legal tender in Russia. They were not, however, in fact redeemable in gold. The amount to be issued was limited.

To return, for a moment. On October 11, 1922, a decree established the so-called chervonetz currency — each chervonetz to be equal to ten rubles of the former Russian gold coin, and were to be accepted by the State where " payments should be made in gold." After the 1924 decree the State Bank instructed its local organizations to exchange chervonetz for treasury notes at the same rate.

Therefore, since 1924 the Russian currency consists of rubles and chervonetz — each chervonetz equivalent to ten rubles. And the ruble has remained substantially at par, or 0.5146 per ruble, practically the rate existing prior to 1914.

The question is whether plaintiffs are entitled to be paid at the exchange value of the imperial ruble, or in Soviet rubles of 1924. If the former, each ruble promised is worth one fifty-billionth of its former exchange value.

The issue of the 1924 rubles was not the establishment of a new currency. After long depreciation, after repudiation of its obligations, the government, in those " every day transactions of business or domestic life " abolished all tokens, all prior issues of Soviet rubles, and again placed the ruble on a gold basis, on the same basis and having practically the same value as the ruble prior to 1914. Chervonetz may be a new name for a note. But one chervonetz means but ten rubles.

I think this question has been decided. In *Matter of People* (255 N. Y. 428) the problem to be solved was whether as to a debt due in June, 1923, payment should be made in chervonetz rubles, or in the depreciated rubles then in circulation. As to this the opinion of Judge CARDOZO confined what was said " to the record now before us." If, however, the chervonetz constituted an entirely new currency, having no relation to the old, the discussion was unnecessary.

The facts shown were not unlike those before me. The only Soviet decree in evidence was that of October 11, 1922, authorizing the issue of chervonetz bank notes based on gold, which says nothing as to the rate of exchange between chervonetz and the older paper rubles, then also in circulation and rapidly depreciating. But there

was uncontradicted testimony that this rate was established every month by the Peoples Commissary of Finances. When the tokens or rubles of 1922 were called in there was established a rate of exchange with the new tokens of 1923 — 50,000 to 1. In January, 1923, it was 100,000 paper rubles for one chervonetz ruble. In February 1 to 150,000 of the 1923 tokens. In June all imperial and Kerensky rubles had been called in. On February 24, 1925, the only currency in circulation were chervonetz and bank notes both based on gold.

The facts there considered were similar to those before me, although here they may have been proved in more detail. " We interpret the record as meaning," says Judge CARDOZO, " that in June, 1923, the Russian ruble was again on a gold basis," and continues to state how debts might then be discharged in Russia — a statement which might or might not be justified upon a more complete record.

The equity of this result is obvious. The promise to pay was made at a time when the ruble was worth more than fifty cents. Most of the premiums were paid in these rubles. This is the ruble the parties had in mind. The new ruble has the same value. Any Soviet decree, if there be such, discharging a debtor upon the payment of a worthless token would not be recognized here.

Whatever witnesses called as experts may say, I must interpret the result of these decrees. So interpreted the evidence leads to substantially the same result as in the case cited. During the later years of the imperial regime no rubles actually of gold were in circulation. When a decree speaks of debts " stipulated in gold rubles " it evidently refers to obligations payable in rubles based on a gold reserve as were obligations incurred before November, 1914.

Evidence as to the value of these new rubles in St. Petersburg is not altogether satisfactory, yet there is sufficient to justify a fair inference. In 1925 the chervonetz was quoted in New York at $5.146 or 0.5146 per ruble. A slightly higher quotation appears in 1926. In 1929 the quotation is $5.145 and the same in 1930.

As has been said, these are New York quotations, and may have been " nominal " in the sense that there was no general market for rubles in that city, although that fact is disputed. But foreign exchange transactions being forbidden to private persons in Russia, they all pass through the hands of government agencies at St. Petersburg. All purchases of rubles had to be made through them and they fixed the rate of exchange. Also if an individual received in Russia a dollar draft he must sell it to a government controlled bank which pays him rubles at that fixed rate. So these New York quotations represent the official rate of exchange prevailing at

St. Petersburg, the only rate existing there. For the supply of rubles can be obtained from but one source and a purchaser must buy from it.

Further, as the ruble was on a gold basis, exchange in New York and St. Petersburg should be nearly the same. And the government itself must pay for its purchases abroad in foreign money and to obtain dollars it must pay for them at this rate.

It being the duty of the defendant to pay in the legal tender money in circulation at the time its obligation matures, in these cases from 1925 to 1930, the judgment in plaintiffs' favor might be measured in rubles at the exchange rate of 0.5146, less any dividends or loans received by them measured at the same rate. This result, however, is not altogether fair.

This the plaintiffs recognize. Premiums were at times paid in depreciated rubles. In such rubles dividends were received and loans made. They are, therefore, willing, as I understand it, to limit their recovery for premiums so paid to the exchange value of the ruble at the time of payment, taking the same position as to dividends and loans.

At the time of some of these payments the Kerensky ruble, less valuable than the imperial ruble, but still legal tender, was in circulation. Doubtless premiums were paid in the cheaper medium. In view of the plaintiffs' position this fact must be considered in awarding judgment.

As a result of all this discussion I must find that the plaintiffs in these cases are entitled to judgment for the several premiums paid by each, with interest from the date when the same was paid to the date of judgment herein, less any loans or dividends received, also with interest; the respective amounts to be calculated by taking the exchange value of the ruble in St. Petersburg measured in dollars in New York at the date when the payments were made, using the Kerensky and not the imperial ruble while the latter was in circulation. The several plaintiffs are also entitled to costs.

SUPPLEMENTAL OPINION. (JUNE 11, 1932.)

ANDREWS, Referee. Since the original submission of these cases and the original opinion, with the consent both of plaintiffs and defendant, further testimony has been offered.

That on the part of the plaintiffs has to do with the question whether the impression found on certain policies is the corporate seal of the defendant. For many years on its advertising literature and letterheads as well as upon its seal appeared the representation of a woman and child guarded by an emblematic female figure. The same representation appears in the center of the impression referred

to in the original opinion as stamped upon some of these policies. In regard to its Russian policies, in the ordinary course of business when one matured and was paid a monthly report of it and of other transactions was forwarded to the New York office. With it came the policy itself and the proper proofs of loss. When it arrived it and the accounts with regard to it went first to the foreign department and then to the auditing department of the defendant, to be checked. It then went to the claims department to be rechecked. Finally the policy and proofs were placed in a permanent file. Of such policies there are over a thousand filed in New York. The plaintiffs' attorneys have in their possession 130 Russian policies. Ninety of them bear the wafer having the imprint that has been described. None issued before 1903 were without it. The assistant secretary of the Equitable produced from its files twelve of these matured policies issued in 1890 and later, all with a similar impression.

I have held that this is not the corporate seal of the defendant. And I am unwilling to find that this testimony justifies the conclusion that it was a seal adopted for its Russian business, and that its agents in St. Petersburg were authorized to affix it to policies giving to them the force and effect of sealed instruments.

The defendant offered testimony upon two issues. The first was as to the value of the ruble between January 1, 1925, and December 31, 1930.

As bearing upon this subject a number of decrees and manifestos beginning in 1768 were received in evidence. They have no direct bearing on the subject. At most they furnish a background said to be helpful in interpreting the subsequent history of Russian currency. Later decrees seem to lead to the conclusion already reached by me that when a contract matured or a debt became due it could be liquidated in Russia in any currency then legal tender, whether or not the value of the ruble had depreciated. There is also testimony that a contract made in 1900 and maturing in 1923 could under the Soviet decrees be satisfied by payment in rubles then existing at the established rate of equivalence between the new and the old ruble. There is also testimony that at various times between 1925 and 1930 exchanges between dollars and rubles were made at less than the official rate. These under Soviet law were illegal transactions between private persons, dangerous as to them. In view of what we know of Russian conditions and the need and desire of many to escape from the country at any pecuniary sacrifice, these " bootleg " dealings, as they have been described, furnish little indication of the true exchange value of the ruble. Reference is again made to the " pre war ruble " as an " ideal reckoning unit." Ideal or not the

reference was to an imperial ruble, containing a fixed quantity of gold, or a ruble in the form of a State credit note worth about fifty-one cents in our dollars. The phrase " ideal reckoning unit " means only that after the war there was no ruble in circulation having any such value. I see no reason for a change in my original conclusion.

I have held in the Rodkinson case that a certain letter from the defendant to the insured was a repudiation of all liability under the policy. Giving notice to that effect an action such as the present should have been brought within six years.

The defendant now offers in evidence letters said to have been received by Fahrbach (Pp. 54 and 69), Elfenbein (P. 100), Suessman and Bertsky (P. 49). In the Fahrbach cases there is no evidence that any letter, whether in repudiation of his policies or not, was ever mailed to or received by the insured. The same thing is true in regard to a letter to Elfenbein. A letter from the defendant to Suessman was produced by the plaintiff. It is dated February, 1920, was sent to him from Berlin and was signed by an assistant cashier of the defendant there. It is no such repudiation of obligations under the policy as occurred in the Rodkinson case. The same thing is true in the Bertsky case.

In the Ramm case there was dispute as to the mailing and receipt of a certain letter. It was agreed that the referee should not determine that particular case until further testimony in that regard be taken before a notary and submitted to me.