Nisson Goldberg Rudkowsky, Plaintiff, *v.* The Equitable Life Assurance Society of the United States, Defendant.

Supreme Court, New York County, November 25, 1932.

*Borris M. Komar*, for the plaintiff.

*Davis, Polk, Wardell, Gardiner & Reed [John W. Davis, William C. Cannon* and *David E. Hudson* of counsel], for the defendant.

FRANKENTHALER, J. This action is based upon two policies of life insurance issued by the defendant in Russia to the plaintiff, then a resident of that country. The defendant is a corporation incorporated under the laws of this State as a mutual association to engage in the business of life insurance. A detailed history of its operations in Russia is to be found in a comprehensive and illuminating opinion recently handed down by WILLIAM S. ANDREWS (formerly judge of the Court of Appeals) as official referee in twenty-six actions brought against this defendant upon other policies issued by it in Russia (*Dougherty* v. *Equitable Life Assur. Soc. of U. S.,* 144 Misc. 363). Only a few of the facts regarding the defendant's Russian operations need be stated here. The defendant was permitted to do an insurance business in Russia by a law enacted in that country in the year 1890, supplementing a decree of the Russian government passed in 1871. This law was amended in 1897 and at various times thereafter. Among the conditions imposed by the government and accepted by the defendant was one which required the latter to make certain deposits in the Russian State Bank, to serve exclusively as a guaranty of the defendant's liabilities on insurance written in Russia, and another which required the defendant to guarantee the fulfillment of its Russian obligations with "all the property belonging to the Society." A special

agency for the defendant's Russian business was established at St. Petersburg, and a general manager for Russia appointed, who was to reside permanently in that city. Although final acceptance of an application for insurance was dependent upon the decision of the home office in New York city, the policy, if the application was approved, was delivered to the insured in Russia only after having been countersigned by the Russian manager. The policies issued in Russia were in the Russian language; they were payable in rubles either at St. Petersburg or by transmission of the amount directly to the beneficiary; premiums were also to be paid in rubles at St. Petersburg; notices called for by the policies were to be given to the defendant at St. Petersburg; and in the event of an election by an assured to receive the cash surrender value, or a paid-up policy, he was required to surrender the original policy to the general manager at St. Petersburg. In short, the policies were made in Russia and were to be performed there. They were payable out of the general assets of the defendant if the fund resulting from its deposits proved insufficient, or if payment could not be made therefrom for other reasons.

On or about November 11, 1902, the defendant issued to the plaintiff a twenty-year endowment policy for 5,000 rubles, and on or about December 10, 1905, it issued to him another twenty-year endowment policy for 10,000 rubles. The plaintiff resided in St. Petersburg at the time. In 1914 the great war broke out. In March, 1917, the imperial government was overthrown, and the Kerensky government established. In November, 1917, the Soviet revolution took place and resulted in the setting up of a new government, which on December 1, 1918, issued a decree declaring insurance to be a State monopoly and providing for the liquidation of all private insurance companies and the confiscation of their assets. The defendant's St. Petersburg office was not closed by the government until December 14, 1918, but between December 1, 1918, and December 14, 1918, no business of any kind could be or was transacted there. In March, 1919, a second decree released the State from the payment of debts arising before the nationalization of the companies. A subsequent edict, dated November 18, 1919, abolished life insurance and canceled all contracts relating thereto. On or about January 1, 1920, the defendant wrote off its books all its Russian assets and liabilities.

The decree of December 1, 1918, did not, however, operate to discharge the defendant from the obligations it assumed under the policies which it had issued, guaranteed as they were by the general assets of the defendant. This is the effect of the holding made by the Appellate Division in this department in *Dougherty* v.

*Equitable Life Assur. Soc. of U. S.* (228 App. Div. 624). This is also the ruling made by Judge ANDREWS in *Dougherty* v. *Equitable Life Assur. Soc. of U. S.* (144 Misc. 363, 372). (See, also, *Sliosberg* v. *New York Life Ins. Co., Nos. 1 & 2,* 217 App. Div. 685; *Sokoloff* v. *National City Bank,* 239 N. Y. 158.)

While these various changes in government were taking place, and, indeed, from the time that the policies were issued to him, the plaintiff had been paying the premiums on them semi-annually, in accordance with their provisions. The evidence establishes to the court's satisfaction that the last premium paid on the policy issued in 1902 was that due on November 11, 1918, and that the last premium paid on the other policy was that due on June 10, 1918. These premiums were paid in the months of November and June, 1918, respectively.

Each policy provided that it would lapse and become null and void on the first day of the third month after a premium became due if the premium was not paid by that time together with interest from its due date. It further provided that an assured who had paid not less than three full annual premiums might receive the surrender value, within one year from the lapsing of the policy for non-payment of premium, upon surrender of the policy to the general manager at St. Petersburg.

The first cause of action alleged in the complaint seeks the cash surrender value of the policy issued in 1902. The premium due and paid on that policy in November, 1918, paid for insurance up to May 11, 1919. No further premium was paid on the policy. The plaintiff, therefore, became entitled to receive the surrender value at any time during the two months' period of grace, beginning on May 12, 1919, or the year succeeding that period. In view of the closing of the defendant's office at St. Petersburg in December, 1918, the plaintiff was excused from notifying the defendant at that office of his election to receive the surrender value, and he was likewise relieved of the necessity of tendering his policy for surrender. As Judge ANDREWS well said in *Dougherty* v. *Equitable Life Assur. Soc. of U. S. (supra,* at p. 374): " The place of performance was the defendant's office at St. Petersburg. If the performance was required there, the implication was that the place of performance would be maintained. This could not be done. But if the defendant was innocent so were the insured. Neither party might do what was expected when the contract was made. Nor did this impossibility impose a duty upon the insured to seek the defendant in some other place. * * * The only result was to excuse the insured from the conditions precedent to the receipt

of the money promised him. * * * Possibly had the defendant's office in St. Petersburg been reopened other questions might arise. It never has been. (*Cohen* v. *New York Mutual Life Ins. Co.*, 50 N. Y. 610.)"

If, as the defendant contends, the policy issued in 1902, like that issued in 1905, was not under seal, the six-year Statute of Limitations of this State (Civ. Prac. Act, § 48) is applicable even though the Russian statute may be longer. To quote from the opinion of Judge ANDREWS (at p. 375): "Where the cause of action arises without the State in favor of a non-resident, the shorter time prescribed either by our statute or by the statute of the country where it arose governs. (Civ. Prac. Act, § 13.) Here an action upon a sealed instrument must be brought within twenty years (Civ. Prac. Act, § 47); upon a contract obligation, express or implied, within six years. (Civ. Prac. Act, § 48.) In Russia in either case the time allowed was ten years."

The present action was commenced on October 6, 1930. Our six-year statute would bar the action unless the cause of action for the cash surrender value did not accrue until October 6, 1924, or thereafter. Obviously it accrued long before that date. The plaintiff might have maintained this action at any time after May 11, 1919. He may not say that the cause of action did not arise until he had performed the conditions precedent whose performance was excused because impossible. In *Dougherty* v. *Equitable Life Assur. Soc. of U. S.* (*supra*) Judge ANDREWS made this answer to a similar contention (pp. 376, 377): "Perhaps the shortest answer to this proposition is the present action itself. Proofs have never been filed. This failure to comply with the provisions of the policy is excused. But if an action might be maintained in 1930 so it might have been maintained in 1921. The cause of action, in other words, had accrued. But even in the ordinary case, where the policy does not limit the time within which proofs of death must be filed and the condition that they be filed is a prerequisite to recovery, the running of the statute may not be suspended indefinitely by the unexcused action of the beneficiary. It cannot be that he may delay twenty or fifty years before his cause of action accrues. Only a reasonable time is given him for this purpose. (37 C. J. 953.) I do not think that the various New York cases cited by the plaintiff are inconsistent with this conclusion. The statute began to run on this theory either from Mr. Taube's death, or from two months thereafter, or from this two months plus a reasonable time. In either case an action brought in 1930 was too late."

So here, if this action could be maintained in 1930, it might have

been maintained in 1919. The statute began to run either on May 11, 1919, or two months thereafter, or from this two months plus a reasonable time. The action brought in 1930 was too late.

As a matter of fact, the plaintiff concedes that the first cause of action would be barred by our six-year Statute of Limitations if the policy be regarded as an unsealed instrument. It is the plaintiff's claim, however, that the policy is an instrument bearing the defendant's seal, and that our twenty-year Statute of Limitations applies, rather than the six-year statute.

The situation here in respect to a seal is substantially identical with that presented in some of the actions tried before Judge ANDREWS as official referee. The evidence before Judge ANDREWS established that some of the defendant's policies " bore an impression on wafer or on paper, bearing in the Russian language the legend ' Equitable Life Assurance Society of the United States in New York. Chief Management for the Russian Empire.' " This seal was in the St. Petersburg office of the defendant and, when used, was placed upon the policies by its representatives. None of the policies upon which the seal was placed contained any reference to the seal. The defendant had a seal of its own in its main office in New York. This was unlike that employed by the St. Petersburg branch. The policies required no seal. As pointed out by Judge ANDREWS in his supplemental opinion (pp. 390, 391), Russian policies of the defendant, bearing the Russian seal, were from time to time transmitted to and filed in the home office in New York after they had matured and been paid. The defendant was, therefore, aware of the use of the seal by the Russian office. On these facts Judge ANDREWS held that there was no proof that the defendant had adopted the Russian seal as its own corporate seal, or that it had authorized any of its officers to do so. In reaching this conclusion, Judge ANDREWS took the view that the requirement of the laws constituting the defendant's Russian charter (the " Pravila "), that defendant's Russian manager should be given power to bind the defendant in relation to its operations in Russia, was insufficient in itself to confer upon said manager authority to affix the Russian seal to policies so as to give them the force and effect of sealed instruments.

The plaintiff attempts to distinguish Judge ANDREWS' decision. The evidence does not, however, support the plaintiff's claim that *all* policies issued in Russia by the defendant between 1870 and 1890 bore the defendant's own corporate seal. Nor does the evidence establish that *all* Russian policies issued by the defendant after 1890 and until 1905 bore the seal of the Russian branch. As to the contention that the Russian seal was used with the

knowledge of and without any objection by the main office in New York, it need only be pointed out that the record before Judge ANDREWS also established that fact. The court is unable, therefore, to perceive the presence in the instant case of any circumstance which might differentiate it from the cases involving the use of the Russian seal decided by Judge ANDREWS. In this situation the court is unwilling to reach a conclusion diametrically opposed to that arrived at by that able jurist after the careful and painstaking consideration of the law and the facts which his learned opinion indicates he gave to the actions tried before him. The court accordingly holds that there is insufficient proof in the present record to sustain a finding that the Russian seal was one adopted by the defendant for its Russian business or that its agents were empowered to affix it to policies so as to give them the force and effect of sealed instruments. The first cause of action is, therefore, barred by our six-year Statute of Limitations, and it is, accordingly, unnecessary to consider whether the Russian Statute of Limitations of ten years commenced to run upon the accrual of the cause of action, as the defendant contends, or upon the commencement of the action, as the plaintiff argues. It is likewise unnecessary to determine whether the running of this statute was suspended because of the closing of the Russian courts to controversies arising out of civil relationship originating prior to the Soviet revolution. The motion to dismiss the complaint is granted as to the first cause of action.

The second cause of action, as pleaded in the original complaint, sought the cash surrender value of the policy issued in 1905. This policy did not bear the Russian seal or any other seal. The second cause of action, like the first, is, therefore, barred by our six-year Statute of Limitations. This is conceded by the plaintiff. During the trial, however, in accordance with a notice of its intention to do so, served prior to the trial, the plaintiff moved to amend the second cause of action from one for the cash surrender value of the policy to one for the face amount of the paid-up policy to which the plaintiff was entitled upon the basis of the premiums paid. This motion was granted, the defendant at the same time being given permission to interpose the Statute of Limitations as a defense to the amended cause of action.

It remains to consider whether the second cause of action, as amended, is barred by the plaintiff's failure to perform conditions precedent, or by the Statute of Limitations, or by an alleged election of remedies on the part of the plaintiff. The policy issued in 1905 contains a provision that the assured, after the payment of three full annual premiums, may discontinue payment of premiums

without terminating his insurance. Paragraph 23 of the policy rules gives him the right to a paid-up policy for a reduced amount within six months from the expiration of the period covered by the last premium payment. As the last premium paid was that due on June 10, 1918, the plaintiff had six months from December 10, 1918, in which to claim the paid-up policy. In addition to the policy rules, the policy contained "Special Privileges and Conditions." One of them (Par. VI) read: "Provided premiums shall have been paid for the periods respectively mentioned in the following table, there will be granted, *without application on the part of the Assured*, a Paid-up Policy * * * for the amount fixed in said table." (Italics the court's.)

Assuming that the plaintiff was required to notify the defendant of his election to receive a paid-up policy or to surrender the original policy, the performance of these conditions was excused by the impossibility of their performance resulting from the closing of the St. Petersburg office in December, 1918. The policy required notices to be given and policies to be surrendered to that office.

We come now to the question of the Statute of Limitations. In view of the provision that a paid-up policy would be granted "without application on the part of the Assured," the plaintiff, upon discontinuing the payment of premiums, became automatically entitled to a paid-up policy, maturing on December 10, 1925 (the maturity date of the original policy), but in an amount less than the face amount of the original policy. He was not obliged, however, to sue the defendant to compel the issuance of a paid-up policy. He could await the maturity date of the paid-up policy, and then sue for the amount of paid-up insurance to which he was entitled. In *Weatherbee* v. *New York Life Ins. Co.* (182 Mass. 342) the company had refused to issue a paid-up policy. The insured waited until the paid-up policy would have matured, and then sued for the value of the paid-up policy which had never been issued to him. Mr. Justice HOLMES, as chief justice of the court, said (at p. 345): "If the plaintiff had had what she had a right to, the paid-up policy would be payable now. Therefore the measure of damages is the sum that would have been paid on such a policy if issued, and the judgment of the Superior Court was right. *Timayenis* v. *Union Ins. Co.*, 21 Fed. Rep. 223, *National Ins. Co.* v. *Haley*, 76 Maine, 268, 273."

In *Wheeler* v. *Connecticut Mutual Life Insurance Co.* (82 N. Y. 543) our Court of Appeals said (at pp. 554 and 555): "The same rule applies as when insurance companies, or their agents, have made contracts to issue policies which have neither been made out nor delivered. In such cases the loss is payable the same as

if a policy had been actually issued and delivered. Although not very distinctly or precisely set forth, a cause of action was stated in substance which entitled the assignee of Vose to a paid-up policy or its equivalent. A refusal to perform this condition created a liability for the amount for which the paid-up policy might have been issued, and this was a good cause of action, for which the plaintiff was entitled to recover." (See, also, *Missouri Valley Life Ins. Co.* v. *Kelso*, 16 Kan. 481, 484.) It follows that the cause of action for the value of the paid-up policy did not accrue until December 10, 1925, when, for the first time, plaintiff had the right to demand payment of the paid-up policy from the defendant.

It is the defendant's contention, however, that although the summons and original complaint in this action were served on October 6, 1930, the action, in so far as it seeks the value of the paid-up insurance to which the plaintiff was entitled, cannot be deemed to have been commenced until June 13, 1932, the date of the amendment of the second cause of action from one for the cash surrender value of the policy to one for the value of the paid-up policy at its maturity. If this be so, the six-year statute barred the action on December 10, 1931, that date marking the expiration of six years from the maturity of the policy. The principle is well settled that where an amendment substitutes a new cause of action, the action must be regarded as commenced as of the date of the amendment, the rule that an amendment relates back to the date the action was instituted referring only to an amendment which does not create a new cause of action. (*Harriss* v. *Tams*, 258 N. Y. 229, at pp. 241 and 242.) The application of this principle is, however, not infrequently a matter of considerable difficulty as pointed out by Judge LEHMAN, writing for the Court of Appeals in *Harriss* v. *Tams* (*supra*, at p. 242): " it is difficult, perhaps impossible, to formulate from these decisions any test, universally applicable, of what constitutes a different obligation or liability. ' If the amendment merely expanded or amplified what was alleged in support of the cause of action already asserted, it related back to the commencement of the action, and was not affected by the intervening lapse of time. [Citing cases.] But if it introduced a new or different cause of action, it was the equivalent of a new suit as to which the running of the limitation was not theretofore arrested. [Citing cases.] ' (*Seaboard Air Line Railway* v. *Renn*, 241 U. S. 290, 293.) Perhaps in these cases we can discern an increasing liberality in determining what constitutes a ' new or different cause of action.' "

The following question propounded by Judge LEHMAN in *Harriss* v. *Tams* (*supra*, at p. 242) is the question to be determined here:

"The question here is whether the action from its commencement was upon the same obligation or liability, though the cause of action to enforce that obligation or liability has been changed, or a new remedy has been asserted."

In answering that question, Judge LEHMAN indicated that the determination to some extent had to be based on considerations of fairness, and that a liberal, rather than a technical, construction was desirable. He quoted from the language of the United States Supreme Court in *New York Central & H. R. R. R. Co.* v. *Kinney* (260 U. S. 340–346) as follows: "Of course an argument can be made on the other side, but when a defendant has had notice from the beginning that the plaintiff sets up and is trying to enforce a claim against it because of specified conduct, the reasons for the statute of limitations do not exist, and we are of opinion that a liberal rule should be applied."

Judge LEHMAN also quoted with approval other language of the United States Supreme Court in *Friederichsen* v. *Renard* (247 U. S. 207, 210) that even where an action in equity for rescission of a contract on the ground of fraud is by amendment changed to an action at law for damages, "the proceeding at law was but pursuing toward a conclusion, in another form, the same cause of action stated in the original bill, so that the suspension of the statute of limitations continued, which began with the date of the service of the subpoena in chancery." In the light of these precedents, it is the court's opinion that the amendment of the second cause of action was not so substantial or so radical that it called upon the defendant to meet a different obligation or liability, and that the latter is, therefore, not justified in claiming that the action was not commenced until the date of the amendment. The action after as well as before the amendment was one to enforce the defendant's obligation or liability on the policy issued by it in 1905, though the exact nature of the remedy may have been changed in the amended cause of action. It follows that the amendment here related back to October 6, 1930, the date of the commencement of the action, and that the cause of action for the value of the paid-up insurance is, therefore, not barred by the Statute of Limitations.

We come now to the defendant's claim that the plaintiff made a binding election to take the cash surrender value, which precludes him from maintaining an action for the value of a paid-up policy. The service of the original complaint in the year 1930 was not such an election because at the time it was served the plaintiff no longer possessed the right to claim the cash surrender value, the Statute of Limitations having run against the cause of action

for the cash surrender value. It is well settled that there can be no binding election between inconsistent remedies unless both remedies actually existed at the time of the election. (*Clark* v. *Kirby*, 243 N. Y. 295, 303; *Schenck* v. *State Line Telephone Co.*, 238 id. 306, 310, 311, 312; *Urdang* v. *Posner*, 220 App. Div. 609, 611.) Nor did the letters written by the plaintiff to the defendant, dated June 14, 1920, and July 25, 1925, constitute a binding election to accept the cash surrender value of the policies. The relevant portion of the letter of June 14, 1920, reads as follows: " Now I am constrained to demand you to justify my trust which I have had this 17 years in your honorable Co. and to lend me some money under the guarantee of my insurance or to admit the liquidation of my insurance in dollars. * * * In the last years the Americans have made themselves known for their practicability and philanthropy and I am sure that you will consider my cause not from the point of view of the rigid law, but as kind and honest men who are citizens of the richest and the most powerful country in the world."

The court does not interpret this letter as constituting a demand by the plaintiff for the cash surrender value of his policy. The wording of the letter indicates that the plaintiff was asking for either a loan or the cash value of his policy as a matter of favor, rather than as a matter of right. The plaintiff's failure to demand the cash surrender value as a matter of right may well have been due to the fact that in March, 1919, both policies were taken from the plaintiff's possession during a search of his apartment by soldiers and sailors, under government orders. The policies were never returned to the plaintiff, and it is quite possible that at the time he wrote the letter of June 14, 1920, he did not realize exactly what claims he could rightfully make upon the defendant under his policies.

The relevant portion of the letter of July 25, 1925, reads as follows: " Knowing that several American Companies are purchasing their own policies from their insurers back again, I should be pleased to hear from you if you would be willing to buy also my policy and if possible in American dollars." This letter, too, appears to be nothing more than a request that the defendant, as a matter of favor, purchase the policies from the plaintiff. It falls short of constituting a demand, as a matter of right, upon the defendant for the payment of the cash surrender value of the policies. In any event, it is only where a party elects an inconsistent remedy, *with knowledge of all the facts*, that a binding election is deemed to have been made. The rule, as stated in *Clark* v. *Kirby* (*supra*, at p. 303), is that " where a party, *knowing all the facts*, elects to

sue in rescission instead of for damages, he must pursue the course he has taken." (Italics ours.) Here the plaintiff, at the time the letters were written, no longer had possession of the policies. He appears to have been unaware of the fact that he was entitled to paid-up insurance on the second policy. It was not until the examination before trial of the defendant, after the commencement of the present action, that the plaintiff learned of the provision that he was automatically entitled, on discontinuance of premiums, to a paid-up policy in a reduced amount. It is the court's conclusion, therefore, that the letters written by the plaintiff prior to the institution of this action did not constitute a binding election of remedies, precluding the assertion of a claim for the value of the paid-up insurance. The letters were not demands for the cash surrender value of the insurance as a matter of right, but were merely requests for money on the insurance, as a matter of favor on the part of the defendant. Even if interpreted as demands for the cash surrender value, they were written in ignorance of the provision in the 1905 policy that the plaintiff was entitled to paid-up insurance upon his discontinuing the payment of premiums, without application on his part.

The 1905 policy, like the 1902 policy, was payable at St. Petersburg in rubles. The plaintiff is entitled to recover here the value of the rubles in St. Petersburg as of December 10, 1925, the date of the maturity of the paid-up policy, measured in dollars in New York city, where he has sought his remedy. (*Parker* v. *Hoppe*, 257 N. Y. 333, 340; *Sokoloff* v. *National City Bank of New York*, 250 id. 69, 81; *Dougherty* v. *Equitable Life Assur. Soc. of U. S.*, 144 Misc. 363, 385.) During the month of December, 1925, the exchange value of each ruble was fifty-one and four-tenths cents in American money. That is the proof in this case, and it is also the value found by Judge ANDREWS in the actions tried before him (p. 389). The plaintiff was entitled to paid-up insurance amounting to 6,500 rubles, and judgment is, therefore, directed in his favor for 6,500 rubles at fifty-one and four-tenths cents per ruble, or $3,341, with interest thereon from December 10, 1925, together with costs and disbursements of this action. The motions to strike out, upon which decision was reserved, are denied, with appropriate exceptions. The motions to dismiss the complaint as to the second cause of action and for a direction of a verdict in favor of the defendant on that cause of action are denied, with exceptions to the defendant.